S. W. OVIATT *vs.* DAKOTA CENTRAL RAILWAY COMPANY.

May 19, 1890.

Railway—Duty to Passengers in Freight or Mixed Trains.—Carriers of passengers are bound to use the best precautions in known practical use to secure the safety of their passengers; and this is the measure of their duty whether they carry them on freight or mixed trains, or on exclusively passenger trains. But this does not require that they should adopt, on freight or mixed trains, all the appliances which they use on passenger trains, but merely the highest degree of care consistent with the practical operation of such trains. *Held,* that there was no evidence in this case that would have justified the jury in finding the defendant

guilty of negligence in not having a bell-rope on a "mixed" train operated as a "way-freight" and "passenger accommodation" combined.

Same—Risks Assumed by Passenger.—When a person takes passage on a freight or mixed train, he assumes all risks necessarily incident to that method of transportation.

Action for personal injuries received in the territory of Dakota. The defendant appeals from an order of the district court for Lyon county, *Webber*, J., presiding, refusing a new trial after verdict of $1,500 for plaintiff.

*Wilson & Bowers*, for appellant.

*M. B. Webber*, for respondent.

MITCHELL, J.   This was an action to recover damages for personal injuries sustained by plaintiff while a passenger on defendant's train. The injury was caused by the breaking in two of the train on a down grade west of De Smet.   The engineer, being unaware of the break, ran his engine, with the front part of the train, down to the water-tank, and stopped, when the rear part came down against it, with accelerating speed, causing a severe concussion, which threw the plaintiff from his seat in a passenger coach in the rear, and seriously injured him.   Various acts of negligence were charged against the company in the equipment and handling of the train, such as using a defective coupling-pin, not supplying the train with sufficient brakemen, careless management of the train, both before and after it broke; also the failure to have a bell-rope on the train.   It was claimed that, if the train had been supplied with a bell-rope, the breaking of the train would have caused the bell to ring once, which the engineer, according to usual code of signals, would have supposed to be a signal from the conductor to stop; and that if this supposed signal had been obeyed, the front part of the train would have been stopped before it had gotten far from the rear part, and the concussion would consequently have been much less severe, and the injury to plaintiff probably avoided.   The only question which we find it necessary to consider is whether the trial court erred in refusing to instruct the jury "that on the evidence they could not find the defendant ought to have a bell-rope on the train."   It was the undisputed evidence that this was what may be called "the mixed

accommodation train" between Huron and Tracy, which leaves Huron in the evening at 8 o'clock, and consists of an engine and tender, more or less freight-cars, and a baggage-car and passenger coach in the rear. The defendant was accustomed to carry passengers on this train in the coach in the rear. The freight-cars varied according to business; sometimes they amounted to 25. It was run as a "way" freight, cars being taken on or set out at intermediate stations, as occasion required. The particular train on this occasion had only two freight-cars when it started from Huron, but had taken on 13 others at intermediate stations before the accident occurred. The train had no bell-rope. All the evidence bearing upon the propriety, necessity, or practicability of using bell-ropes on such trains was elicited from defendant's witnesses, who were also its employes or ex-employes, and more or less expert in the operation of railways. It is impracticable here to state their evidence *in extenso*, but a full and fair summary of it all is that, while they had known cases where a bell-rope had been used on "*through*" freight or mixed accommodation trains, (those which do no switching, and neither take in nor set out cars at intermediate stations,) made up of only a limited number of cars, not exceeding 10 or 12, yet they never knew of a rope being used on a "way" freight or mixed train; that the use of a bell-rope on a "way" freight or mixed train, like this between Huron and Tracy, was impracticable, for the following reasons: *First*, every time a car is taken in or set out, or a switch made, at an intermediate station, the rope would have to be divided and carried back, and afterwards coupled on again; *second*, that in windy weather it would blow all over the top of the cars, to the inconvenience and danger of the brakemen; *third*, that with the varying length of the train, as cars were taken in or set out, the rope would have to be lengthened or shortened; *fourth*, that the greater the length of the train the greater the slack in the rope, and the greater the friction by its contact with the cars, foot-board, etc., and hence that it is almost impossible to pull a rope over 10 car-lengths; that about three years before the experiment had been made of putting a rope on this very train, and that it blew all over the top and sometimes down the sides of the cars, and on one occasion caused

the death of a brakeman, after which it was taken off. One witness did say that he had seen on a mixed train a windlass in the forward part of the baggage car to take up and let out the rope, according to the length of the train; but he did not expressly state whether this was a "through" or "way" freight, but it is clearly implied from his other testimony that it was not used on a "way" freight. None of this evidence was rebutted or impeached; and while part of it was the opinions of the witnesses, yet it will be observed that they gave reasons for them, some of which, at least, seem cogent and persuasive.

Carriers of passengers are, of course, bound to use the best precautions in known practical use to secure the safety of their passengers, or, as the rule is sometimes stated, they are held to the highest possible care. This rule applies when they carry passengers on mixed or freight trains, as well as when they carry them on regular passenger trains. But this does not mean that they are required to use every possible preventive of danger which the highest scientific skill might have suggested, nor all the care and diligence which the human mind can conceive, nor such as would render the transportation free from all peril. It would not, for instance, in the present state of railroading, require the use of iron or stone cross-ties, because less liable to decay than wood. Neither does it require that, when they carry passengers on mixed or freight trains, they should adopt all the appliances to insure safety which they use on exclusively passenger trains; for when a passenger takes passage on such trains he assumes all the risks reasonably and necessarily incident to being carried by the method which he voluntarily chooses. What the law does require is everything necessary to the security of passengers, consistent with the business of the carrier and the means of conveyance employed,—the highest degree of care consistent with the practical operation of such trains. While it is easy to thus lay down a general rule as to the measure of the carrier's duty, it is true, as the trial judge remarked, that it is not always easy to determine whether it is a question of law for the court or of fact for the jury to decide whether in a given case the doing or omitting to do a thing is negligence. It is also true that,

when the standard of duty is not fixed, but is variable or depends upon a variety of circumstances, the question of negligence is ordinarily one for the jury; and the fact that all the evidence is on one side does not necessarily warrant the court in taking the question from the jury. It may be of such a character, notwithstanding that it is not directly contradicted, that it would be the province of the jury to weigh it, and draw their own conclusions. But the jury have no right arbitrarily to reject evidence, nor to find a verdict against the entire weight of it. Nor is it true that, in every case where the standard of duty is not definitely fixed, but depends on circumstances, the question of negligence is one for the jury, regardless of the state of the evidence. Our own decisions abound in cases of that kind, where we have held, as a matter of law, that the evidence established, or failed to establish, negligence. It is also to be remembered that the burden of proof is on the plaintiff. If he claims to hold the company liable for failing to provide a bell-rope, it is not enough for him to prove that none was furnished. The law requires of him *prima facie* proof that the omission to do so was negligence. It is not like the case of a broken rail or axle, when the fact of the accident might constitute presumptive evidence of negligence. It is to be further noticed that this matter of failure to provide a bell-rope is in itself a separate, complete, and independent charge of negligence. Consequently a fair test whether the evidence on that point made a case for the jury is, would it have supported a verdict in favor of the plaintiff had this been the only negligence charged against the defendant?

Applying what has been said to the case in hand, we are constrained to the conclusion that there was no evidence which would have justified the jury in finding that defendant was negligent in not having a bell-rope on this train; that if they had so found it would have been not only against the great weight of the evidence, but absolutely without any evidence whatever to sustain it; and therefore the court ought to have granted defendant's request. There is another consideration which we think has much force. The conceded purpose of a bell-rope is to enable the conductor to signal the engineer. The ringing of the bell caused by the train breaking in two would not advise the engi-

neer of that fact. It so happens that, in view of the adopted code of signals, one ring of the bell means to stop; hence the engineer would suppose the one ring caused by the break was a signal from the conductor to stop. It may be that, under the peculiar circumstances of this case, to stop the engine would have the best thing to do, but this was purely accidental. Under other circumstances, the best course might have been for the fore part of the train to run away from the rear part, and that to stop would be the very worst thing to do. So far as appears, where a train like this breaks in two, the false or supposed signal to the engineer would be as likely to aggravate as to mitigate the injurious consequences of the accident. The signalling of the engineer of the breaking of the train being entirely foreign to the object of a bell-rope, we do not see how it can be said that the absence of it was in any sense the proximate cause of plaintiff's injury. But, however this may be, we are of opinion that, for the reasons already given, the court erred in refusing the request. A new trial must be ordered, and this renders it unnecessary to consider the other questions discussed by counsel.

Order reversed.