THE PEOPLE *ex rel.* W. S. Cantrell *et al.*

*v.*

THE ST. LOUIS, ALTON AND TERRE HAUTE RAILROAD CO.

*Opinion filed December 21, 1898.*

1. RAILROADS—*lessee of a railroad assumes obligations of the lessor's charter.* A lessee of a railroad assumes the rights, franchises and obligations contained in the lessor's charter and must conform to its requirements.

2. SAME—*when the duty of running a train for passengers exclusively is implied.* The duty of furnishing a separate train for passengers only, and not for freight and passengers together, is implied in the duty of a railroad company to furnish necessary rolling stock and equipment for the suitable and proper operation of the road.

3. SAME—*mandamus lies to compel railroad to run separate passenger train.* A duty sufficiently specific to be enforced by *mandamus* is imposed upon a railroad company with respect to the running of a passenger car or cars separately from freight cars.*

4. SAME—*sufficiency of earnings to justify running separate passenger train—how determined.* The sufficiency of the earnings of a railroad to justify the expense of running a separate passenger train over a certain branch line constituting part of the entire system is not to be determined by considering the profits of that branch alone, but of the whole business of the various parts of the road operated with the branch as one continuous line.

5. SAME—*when preferred stock of railroad company cannot be considered in determining indebtedness.* Preferred stock of a railroad company is not an indebtedness which can be considered in determining whether its obligations are such as to prevent its operating a passenger train separately from its freight trains.

APPEAL from the Circuit Court of Franklin county; the Hon. A. K. VICKERS, Judge, presiding.

This is a petition for a writ of *mandamus* in its amended form, presented in the name of the People of the State of Illinois, at the relation of William S. Cantrell, a citizen and property owner of Benton, Franklin county, Illinois, as a patron of the defendant railroad company, the prayer

*For a collection of the authorities on *mandamus* to compel the operation of a railroad, see note to *State ex rel.* v. *Dodge City, M. & T. Ry. Co.* (Kan.) 24 L. R. A. 564.

of which petition is as follows: "That a writ of *mandamus* be issued, directed to the St. Louis, Alton and Terre Haute Railroad Company, commanding it to cause to be furnished, placed, run and operated on said railroad extending from Eldorado to DuQuoin, a daily (Sundays excepted) passenger train, each way, suitable and sufficient to carry all passengers with their necessary baggage, in comfortable and reasonable security, and at a reasonable speed, and to operate said line of railroad from East St. Louis to Eldorado as a continuous line, and that upon final hearing hereof such further order be made in the premises as to the court shall seem meet and proper."

The petition was answered by the respondent railroad company; a replication was filed to the answer, except as to one paragraph thereof which was demurred to, and the demurrer sustained; a jury was waived, and the cause was submitted by agreement for trial before the circuit judge without a jury; the trial judge rendered judgment refusing the prayer of the petition, and dismissing the same, from which judgment this appeal is prosecuted.

A large amount of testimony, oral and documentary, was introduced upon the hearing, including reports of the respondent company to the railroad and warehouse commissioners, the charter of the Belleville and Eldorado Railroad Company, as found on pages 485, 486 and 487 of the Private Laws of 1861; and the lease executed by the Belleville and Eldorado Railroad Company to the respondent in 1880.

The petition avers, that the railroad of the Belleville and Eldorado Railroad Company is the only railroad in Franklin county, and also contains the following averments: "That on or about December 1, 1893, numerous citizens of said towns of Benton, Eldorado, Christopher, Mulkeytown, Thompsonville, and other towns along said line of railroad, presented petitions to the said railroad and warehouse commission of the State of Illinois, com-

176—33

plaining of the train service on said railroad extending from Eldorado to DuQuoin, and setting forth the alleged facts relating thereto, and asking the said commission to take cognizance of their complaint, and by appropriate order or orders, or by appropriate suit or suits, compel the said St. Louis, Alton and Terre Haute Railroad Company to run its trains through from St. Louis to Eldorado as one continuous line, and run a daily through passenger train, with appropriate connections with other trains at DuQuoin and Eldorado, and give the public such further relief in the way of train service on said railroad as justice and right demand; that thereupon said commission gave notice to said railroad company of the presentation of said petition, and such action was thereupon afterwards taken and had by said commission, that on January 9 and 10, 1894, a hearing was had at Benton on said petition, at which time and place said railroad company was present and represented by its president, Hon. George W. Parker, and its counsel, F. M. Youngblood, and the said petitioners were represented by Hons. C. H. Layman and D. R. Webb, and thereupon, after hearing and considering the evidence introduced by the petitioners and the said company, the said commission made and promulgated the following order or recommendation in the premises, to-wit: 'We therefore recommend to you, the St. Louis, Alton and Terre Haute Railroad Company, that you, without delay, cause to be placed and operated on the Belleville and Eldorado division of your road, in addition to the mixed train now being operated by you on said line, a daily passenger train, suitable and sufficient to carry all passengers, with their necessary baggage, in comfort and security and at a reasonable speed, and that you operate your said railroad from East St. Louis to Eldorado as a continuous line, so that persons desiring to leave Eldorado and intermediate points in the morning of each day (Sundays excepted) may be able to go on said railroad to East St. Louis and return the

same day;' that said St. Louis, Alton and Terre Haute Railroad Company has wholly neglected to comply with the said order or follow said recommendation, but, on the contrary, refuses to comply therewith, and yet continues to run its said train as before, and still fails to accommodate the traveling public."

Such other facts, set up in the pleadings and developed by the proofs, as are necessary to an understanding of the questions involved, are sufficiently stated in the opinion.

H. J. HAMLIN, and A. W. O'HARRA, for appellants:

Preferred stock cannot be considered by the court in relieving the defendant from its duty, if it owes any such duty, in the operation of the train asked for by the petition in this case. Rorer on Railroads, 167-169; *Taft* v. *Railroad Co.* 8 R. I. 310; *St. John* v. *Railway Co.* 22 Wall. 136.

One of the principal of the duties due the State and the general public, as imposed by common law upon common carriers, is the obligation to render service to all persons reasonably, fairly and properly, without injustice to any and with a due regard to the convenience, comfort, health and life of the people. A common carrier of passengers must provide suitable and convenient means of transportation and furnish trains adapted for passenger traffic. 1 Wood on Railroads, 12.

Chartered companies are obliged fairly and fully to carry out the objects for which they are created, and they can be compelled by *mandamus* to do so, and in the case of railroads can be compelled to keep the road furnished with suitable cars, engines and attendants. *State* v. *Railroad Co.* 29 Conn. 538.

While railroad companies have the right to appropriate a portion of their trains exclusively to carrying freight and to exclude passengers from the same, by parity of reasoning the public may compel a railroad company to furnish passenger trains from which freight

cars are excluded, to accommodate the traveling public. *Railroad Co.* v. *Randolph,* 53 Ill. 510.

F. M. YOUNGBLOOD, for appellee:

*Mandamus* will not be awarded in a case where the defendant is clothed with discretionary powers with reference to the act sought to be enforced. *State* v. *Railroad Co.* 23 La. Ann. 333; High on Ex. Legal Rem. secs. 24, 278.

That the officers of respondent are clothed with discretion in arranging the time and manner of transporting passengers and freight over its road is clearly established by the ninth paragraph of the twentieth section of chapter 114 of our statutes.    Starr & Curtis' Stat. p. 1912.

The rule is inflexible that *mandamus* will not lie when the right sought to be enforced is doubtful.    The relator must show a clear and indisputable right to the writ or it will not be granted.    *People* v. *Davis,* 39 Ill. App. 164; *People* v. *Village of Crotty,* 93 Ill. 180; *People* v. *Railroad Co.* 118 id. 113; *Railroad Co.* v. *County Clerk,* 71 id. 27; *Railroad Co.* v. *People,* 120 id. 200; *North* v. *Trustees,* 137 id. 301; *Railroad Co.* v. *Suffern,* 129 id. 274; *St. Clair County* v. *Keller,* 85 id. 396; *People* v. *Lieb,* id. 484; *Oswego* v. *People,* 99 id. 587.

JOHN H. MULKEY, also for appellee:

The writ of *mandamus* never issues except to some corporation, officer, inferior court or other civil tribunal. It is to them what a bill for specific performance is to a mere private person.    It is never used to enforce mere private rights growing out of personal contracts, or other personal injuries.    It runs only against such as are subject to some specific public trust or duty.    High on Mandamus, secs. 1, 321; *People* v. *Dulaney,* 96 Ill. 503.

There are certain indispensable conditions to the issuing of the writ against any person, body of persons or tribunal, or for any purpose, the chief of which is a clear right in the relator or State, as against the respondent, to have the act performed, and a corresponding duty on

the part of the latter to perform it. High on Mandamus, secs. 9, 10; *People* v. *Hatch*, 33 Ill. 9; *People* v. *Mayor*, 51 id.17; *People* v. *Railroad Co.* 55 id. 95; *People* v. *Stookey*, 98 id. 536.

There must not only be a right to the relief sought, and a corresponding duty on the part of the respondent to perform the required act, but the petitioner must show a right to have the thing done in the manner asked. *People* v. *Railroad Co.* 55 Ill. 95; *Highway Comrs.* v. *People*, 66 id. 339; *Swigert* v. *Hamilton*, 130 id. 538.

It is not the duty of a railway company to provide separate passenger trains when its business is not sufficient to warrant it in doing so. *Railway Co.* v. *Camman*, 52 Ark. 517.

While it is true that all railroads are maintained for the public use, and the duty is imposed on them to furnish accommodations for the transportation of all persons and property on payment of fare, yet the law does not prescribe the time or manner of performance of that obligation. On the contrary, the railroad corporations have themselves the power to regulate the time and manner in which passengers and property shall be transported. *People* v. *Railroad Co.* 31 Hun, 125.

A railroad company is bound to furnish only reasonable and ordinary facilities of transportation, which must be used fairly and in such manner, in the prosecution of the company's business, as will afford the largest public benefit. *Railroad Co.* v. *Roe*, 18 Ill. 489; *Railroad Co.* v. *Randolph*, 53 id. 510; *Railroad Co.* v. *People*, 120 id. 200; Cook on Stockholders, sec. 673, and notes; 2 Morawetz on Corporations, (2d ed.) sec. 1119.

Mr. JUSTICE MAGRUDER delivered the opinion of the court:

The main question in this case is, whether a railroad company can be compelled by *mandamus* to run a passenger train. The appellee operates about fifty miles of railroad running from DuQuoin easterly to Eldorado, which

it leased in 1880 for 985 years from the Belleville and Eldorado Railroad Company; and it is conceded, that it runs no passenger train, that is, no train for passenger service exclusively, over this distance of fifty miles between DuQuoin and Eldorado. On Sunday and Monday evenings a train, consisting of a baggage car and one passenger coach, runs from DuQuoin easterly to Benton about eighteen miles, returning from Benton to DuQuoin the next morning about four o'clock; but the only train, which runs the whole length of the branch road between DuQuoin and Eldorado is what is called a mixed train, consisting of coal, stock and freight cars, to which are attached a combination car and passenger coach. This mixed train leaves DuQuoin daily at eleven o'clock A. M. for Eldorado, and returning in the afternoon arrives at DuQuoin at 7:10 P. M. Appellee runs through trains from St. Louis, by way of Belleville, to DuQuoin; but the mixed train in question does not connect at DuQuoin with any of the passenger trains run by appellee from DuQuoin to St. Louis, nor at Eldorado with any of the trains upon the Cairo division of the Cleveland, Cincinnati, Chicago and St. Louis railroad, or the Shawneetown branch of the Louisville and Nashville railroad. Passengers for St. Louis, or points west of DuQuoin, must remain over night at DuQuoin and take the train next morning at 4:50 o'clock.

This mixed train carries freight, express, baggage, stock, mail and passengers; on account of the freight carried and handled, it is a slow train, being often behind its schedule time from twenty minutes to three hours; during the busy shipping season, it often has to be cut in two on the grades, one part going forward to a switch, and returning for the balance of the train including the passenger coach; at Eldorado the entire train is often pushed in front of the engine down to the depot; when the mixed train goes east, the passenger coach, which is used by all classes of passengers both ladies and gen-

tlemen, is between the freight cars and the combination coach; the mixed train has two brakemen, is operated by hand-brakes, and has no air-brakes; the regular passenger trains on the other parts of the road are equipped with air-brakes operated from the engine; the road-bed is a dirt ballast, and the passenger car on the mixed train is dirtier and dustier than the passenger cars on the west end of the road; there is often an odor from the stock cars ahead of the passenger coach; it is bad for ladies and children; the stock cars are frequently filthy and offensive from the manure in them; the train is often delayed at the stations to take on and deliver freight; it is subject to jars that stagger the passengers; much switching is done, and, where switching is done at a station the passenger coach is usually uncoupled; and passengers must wait while the cars are loaded with stock, cattle and hogs, and are often inconvenienced by the gang planks thrown out.

The country, through which the mixed train passes, is a farming country and well settled. The products shipped are mostly grain, mill products and live stock; and the freight distributed along the line is merchandise. St. Louis seems to be the commercial center for that part of the State. Of the counties, through which the mixed train runs, Franklin county has a population of 17,138, Perry county 17,259, Saline county 19,342; and of the towns along the line of the road, DuQuoin has a population of about 5000, Benton 1200, Eldorado 2000, Galatia 800, Thompsonville 500, Raleigh 500, Christopher 200, Mulkeytown 200. Improved lands in that section are worth from $20.00 to $50.00 per acre.

Such being the character of the mixed train, and such being the character and population of the territory through which the mixed train runs, ought appellee to be required to furnish the people with a passenger train? The question is not, whether appellee should run more than one train, but the question is, whether it does all

that it is required to do when it runs a passenger coach attached to a freight train; or whether it is its duty to run one or more passenger coaches, separate and disconnected from freight cars, for the accommodation of passengers only and not of passengers in connection with shippers.

When it is sought by *mandamus* to compel a railroad company to do any act in relation to the equipment and operation of its road, the courts, as a general rule, will not interfere with its management of its railway in these respects, except where the act sought to be enforced is specific, and the right to its performance in the manner proposed is clear and undoubted. (*People ex rel.* v. *Chicago and Alton Railroad Co.* 130 Ill. 175). Whether or not the people are here entitled to relief by *mandamus* against the appellee company must be determined by the answer to the inquiry, whether the act sought to be enforced is specific, and whether the right to a performance of that act is clear and undoubted.

There can be no doubt about the clear legal duty of the appellee to operate the railroad from DuQuoin to Eldorado, leased by it from the Belleville and Eldorado Railroad Company. The act of February 12, 1855, to enable railroad companies to enter into operative contracts, and to borrow money, authorizes railroad companies organized under the laws of Illinois to make contracts and arrangements with each other, and with railroad corporations of other States, for leasing or running their roads, or any part thereof. (2 Starr & Cur. Stat. p. 1921). In case of a lease by one railroad company to another, the lessee assumes the rights, franchises and obligations contained in the charter of the lessor, and must conform to the requirements of said charter. (1 Rorer on Railroads, p. 610; 19 Am. & Eng. Ency. of Law, p. 897). "And when one company leases its road to another, the lessee must, in operating it, be governed by the charter of the lessor." (*City of Chicago* v. *Evans*, 24 Ill. 52). When, therefore, the

appellee leased the road in question from the Belleville
and Eldorado Railroad Company, it assumed the charter
obligations of the latter company and agreed to conform
to its charter requirements.   Section 1 of the act to incor-
porate the Belleville and Eldorado Railroad Company in
force February 22, 1861, declares, that the company "shall
possess all the powers, etc.,   *   *   *   necessary to carry
into effect the objects and purposes of this act, which is
to lay out, build, construct, equip, complete and continue
in operation a railroad from Belleville in St. Clair county
by way of Benton in Franklin county, and Galatia and
Raleigh and to Eldorado in Saline county;   *   *   *   and
they may make connections with any railroad on the line,
or at either terminus, on such terms as may be mutually
agreed upon between the parties." (Private Laws of Ill.
of 1861, p. 485). Section 4 of the act provides that "said
company shall have power, when, in their discretion, they
have a sufficient amount of capital stock subscribed, to
proceed to lay out, locate, construct, build, equip, com-
plete and operate their road." (Idem, p. 486).

It will be noticed, that the charter of the Belleville
and Eldorado Railroad Company provided for the con-
struction, equipment and operation of a railroad "from
Belleville in St. Clair county by way of Benton in Frank-
lin county and Galatia and Raleigh and to Eldorado in
Saline county." As matter of fact, however, the Belle-
ville and Eldorado Railroad Company never constructed
a railroad from Belleville to Eldorado. It constructed
a road about fifty miles long from Eldorado to DuQuoin
in Perry county, the latter place being distant more than
fifty-six miles from Belleville, and, as soon as the road
between DuQuoin and Eldorado was finished, and on July
1, 1880, it leased the latter road to appellee. At that time
appellee owned and operated a railroad running from
East St. Louis, opposite St. Louis, to Belleville, a dis-
tance of a little more than fourteen miles, and, prior to
that time, had leased for a long term of years the rail-

road of the Belleville and Southern Illinois Railroad Company, running from Belleville to DuQuoin, and was then operating the entire line from East St. Louis to DuQuoin as one road, commonly known as the "Cairo Short Line."

The lease made on July 1, 1880, by the Belleville and Eldorado Railroad Company to appellee recites the ownership by appellee of the road from East St. Louis to Belleville, and its lease of the road from Belleville to DuQuoin, and its operation of the two as one line; and also recites the completion of the road from DuQuoin to Eldorado, "and that it is deemed and considered for the mutual interest of the parties hereto," (the Belleville and Eldorado Railroad Company and appellee), "that said roads" (the three roads) "should be placed under the same management and operated as one line; and to that end the party of the second part" (appellee) "has agreed to lease from the party of the first part" (the Belleville and Eldorado Railroad Company) "its railroad from DuQuoin to Eldorado," etc. It thus appears from the recitals of the lease of July 1, 1880, that the object of that lease was to so connect the road from DuQuoin to Eldorado with the roads from East St. Louis to Belleville and from Belleville to DuQuoin, as that the three roads could be operated as one line. And so, although the Belleville and Eldorado Railroad Company did not construct a road from Belleville to Eldorado as its charter provided, yet, by the connection thus made with the road leased by appellee which ran from Belleville to DuQuoin, it became part of a continuous road from Belleville to Eldorado, the terminal points named in its charter.

As the Belleville and Eldorado Railroad Company was bound to equip and operate its road, the appellee, the lessee company, was also bound to equip and operate the leased road. "Equipment," as applied to railroads, has been defined to be "the necessary adjuncts of a railway, as cars, locomotives." (*Rubey* v. *Missouri Coal and Mining Co.* 21 Mo. App. 159; 6 Am. & Eng. Ency. of Law,

p. 655, note 6).    Section 12 of article 11 of the consti-
tution says:   "Railroads heretofore constructed, or that
may hereafter be constructed in this State, are hereby
declared public highways, and shall be free to all per-
sons for the transportation of their persons and property
thereon, under such regulations as may be prescribed by
law."   (1 Starr & Cur. Stat. p. 163).   It follows, that the
obligation to equip, and operate, and continue in opera-
tion, the leased road involves the obligation to furnish
and use cars and locomotives for the transportation of
persons and property, that is to say, for the carriage of
both passengers and freight.   Section 22 of the act of this
State, in relation to fencing and operating railroads, pro-
vides, (2 Starr & Cur. Stat. p. 1940,) that "every railroad
corporation in the State shall furnish, start and run cars
for the transportation of such passengers and property
as shall, within a reasonable time previous thereto, be
ready or be offered for transportation at the several
stations on its railroads and at the junctions of other
railroads, and at such stopping places as may be estab-
lished for receiving and discharging way passengers and
freights."   It is claimed, however, in behalf of appellee,
that, while it is obliged to furnish cars for the carriage
of passengers, yet it is not necessarily obliged to carry
passengers upon a separate passenger train; and that
it has the right to exercise its own discretion as to the
manner of their transportation.   The discretionary power
of railroad companies in this respect is subject always
to the condition, that there is no statutory provision
limiting and restricting such power, and that its exercise
is not opposed to the terms of the charter.   (*People ex rel.*
v. *Chicago and Alton Railroad Co. supra; Mobile and Ohio Rail-
road Co.* v. *People,* 132 Ill. 559; 2 Morawetz on Corp.—2d ed.
—sec. 1119)..   This discretion is also subject to the condi-
tion, that it must be exercised in good faith and with a
due regard to the necessities and convenience of the pub-
lic.   (*People ex rel.* v. *Chicago and Alton Railroad Co. supra*).

Counsel for appellants rely upon articles 1 and 6 of the lease of July 1, 1880. Article 1 is as follows: "The party of the second part shall have, possess and operate the said railroad from DuQuoin to Eldorado, for and during the time hereinbefore mentioned, upon the terms and conditions herein set forth, at all times during the continuance of this lease, furnish all necessary rolling stock and equipment for the complete and perfect operation of the said demised railroad." And in the sixth article the defendant company covenants as follows: "The said party of the second part shall and will, during the term hereby granted, operate, maintain and keep in good repair the railroad and premises hereby demised, and shall, from time to time, make all necessary additions and improvements, and shall and will indemnify and save harmless the said party of the first part, its successors and assigns, from and against all costs, charges and expenses, damages and liabilities whatsoever, growing out of the maintaining, repairing, operating or using of said road." Thus, by the terms of the agreement made for the connection of the road of the Belleville and Eldorado Railroad Company with the roads of appellee, appellee was to operate the three roads from East St. Louis to Eldorado as one road, and to "furnish all necessary rolling stock and equipment for the complete and perfect operation" of the road from DuQuoin to Eldorado.

But, independently of the provisions of the lease, which was a contract between the lessor and the lessee companies, the right of the People to insist upon the running of a separate passenger train is implied from the charter obligation to equip and operate the road. Inasmuch as a railroad company is bound to carry both passengers and freight, the obligation of the appellee required it to furnish all necessary rolling stock and equipment for the suitable and proper operation of the railroad as a carrier of passengers, no less than as a carrier of freight. It cannot be said, that the carrier of

passengers in a car attached to a freight train is a suitable and proper operation of a railroad, so far as the carriage of passengers is concerned. The transportation of passengers on a freight train, or on a mixed train, is subordinate to the transportation of freight, a mere incident to the business of carrying freight. To furnish such cars as are necessary for the suitable and proper carriage of passengers involves the necessity of adopting that mode of carrying passengers which is best adapted to secure their safety and convenience. This can be accomplished better by operating a separate passenger train than by operating a mixed train. That is to say, the duty of furnishing all necessary rolling stock and equipment for the suitable and proper operation of a railroad carrying passengers involves and implies the duty of furnishing a train which shall be run for the purpose of transporting passengers only, and not freight and passengers together.

Railroad corporations, engaged in the transportation of passengers for hire or reward, are bound to the exercise of the highest degree of care and diligence in the conduct of their business. "Their duties and liabilities in this respect extend as well to the appliances used as to the manner of using them." (2 Rorer on Railroads, pp. 948, 949). But there are necessary differences between passenger and freight trains. (2 Wood on Railroads, p. 1288). These differences need not be here noticed, but are well understood and easily recognized.

Railroad companies are not required to adopt, on freight or mixed trains, all the appliances which they use on passenger trains, but they are merely required to use the highest degree of care consistent with the practical operation of such trains. (*Oviatt* v. *Dakota Central Railroad Co.* 43 Minn. 300;  44 Am. & Eng. Railway Cases, 311). When passengers are carried on freight or mixed trains, the care required of the company, so far as such appliances are concerned, is such as the nature of the

train permits. (2 Wood on Railroads, p. 1288). And when a passenger rides on a freight or mixed train, he takes upon himself the increased risk and lessened comfort which is incident thereto; nor has he the legal right to demand any other care in the management of such a train than is requisite for that kind of a train, or any other security than such a mode of conveyance affords. (2 Rorer on Railroads, p. 947; *Galena and Chicago Union Railroad Co.* v. *Fay,* 16 Ill. 558; *Chicago, Burlington and Quincy Railroad Co.* v. *Hazzard,* 26 id. 373.)

It follows, that, when the only train operated by a railroad company is a mixed train, passengers, being unable to ride upon any other kind of train, are forced to incur risks and submit to inconveniences, which do not exist on a separate passenger train. Hence, the operation of a railroad with a mixed train only is inconsistent with the duty of furnishing such cars and locomotives as are necessary to the suitable and proper operation of the railroad when engaged in the passenger traffic. We are not unmindful of the fact, that, within certain limits, a discretion may be exercised as to what rolling stock and equipment are necessary for the suitable and proper operation of a railroad carrying passengers. When the mode of carrying passengers is separate from the mode of carrying freight, the legitimate exercise of discretion may begin. What we hold is, that there cannot be suitable and proper operation of the railroad as a carrier of passengers, when the car, in which it carries its passengers, is part of a freight train, because freight trains are inferior to passenger trains, and travel in them is attended with less comfort, convenience and safety than travel in passenger trains. The inferiority of a freight train to a passenger train as a mode of carrying passengers is so obvious, that no man of ordinary understanding would regard the use of a freight train for the purpose of hauling a passenger car, as a suitable and proper operation of a railroad in the matter of transporting passengers.

We are, therefore, of the opinion that the act here sought to be enforced—the running of a passenger car or cars separately from freight cars—is sufficiently specific to be enforced by *mandamus*, and the right to compel its performance is clear and undoubted, unless such right is changed or modified by the decision of the question, whether the expense of running such a passenger car or train would be justified by the amount of business over the particular line of road running from DuQuoin to Eldorado. Counsel for appellee insists that a railroad company is not bound to provide a separate passenger train when its business is not sufficient to warrant it in doing so.

In *Ohio and Mississippi Railway Co.* v. *People ex rel.* 120 Ill. 200, where the lower court awarded a *mandamus* upon a petition to compel a railroad company to repair and improve generally a certain portion of its road, and to increase the passenger trains thereon, we reversed the judgment, and held that the writ was improperly issued, upon the grounds that the business of the road did not pay the current expenses, that the defendant was unable to perform the acts sought to be enforced, and that the requirement made upon the defendant was too general, and involved too much discretion as to details; but it was there said, that a railroad company could be compelled by *mandamus* to perform any specific duty which it owed to the public as owner or operator of its road, such as operating its road as a continuous line, and running daily trains; and the following language was used (p. 206): "It is believed, however, no case can be found which, *in the absence of a statutory requirement,* has gone to the length of holding that a railway company may be compelled by *mandamus* to increase the number of trains on its road, or to run daily a particular number of trains over its road; and we are satisfied there is no common law authority for making such an order. Of course, where the charter of the company expressly requires that not

less than a given number of trains shall be run daily, the company may be compelled by *mandamus* to perform this, like any other specific duty enjoined by its charter, or by other statutory provision.   *   *   *   A company that runs a daily passenger train each way over a road which cannot, with proper management, be made to keep up repairs and pay running expenses, certainly does as much as the law requires of it, so far as passenger trains are concerned."

There are several marked differences between the *Ohio and Mississippi Railway Co.* case and the case at bar. Here, the appellee does not run a daily passenger train each way over the road from DuQuoin to Eldorado. Here, the charter enjoins a duty, which cannot be regarded as otherwise than specific, in view of the considerations already presented. Here, it cannot be said that the appellee is financially unable to discharge the duty, imposed upon it by the law, and which it owes to the public. The learned circuit judge, before whom this case was tried below, says, in his decision of it, that "defendant railroad company is solvent and in a prosperous condition, its net earnings last year being over $600,000.00, a net income of about $3000.00 per mile of road." After a careful examination, we are satisfied that the statement thus made is sustained by the evidence.

When, however, it is said, that "the defendant railroad company" has a net yearly income of some $600.000.00, the reference is to the defendant railroad company as made up of its branches or leased roads, as well as of the main stem. So far as appears from this record, the main road, owned by appellee and operated under its own charter, is the short line running from St. Louis to Belleville; but, besides the leased roads running from Belleville to DuQuoin and from DuQuoin to Eldorado, appellee also operated three other roads leased by it for long terms of years, to-wit: the Belleville and Carondelet railroad, a short road about seventeen miles long, running west from

Belleville, to East Carondelet on the Mississippi river; the St. Louis Southern railroad, forty-six miles long, which taps said leased road that runs from Belleville to DuQuoin, at Pinckneyville, about ten miles east or northeast from DuQuoin, and runs from Pinckneyville to Marion; and the Chicago, St. Louis and Paducah railroad, about fifty-two miles long, running from Marion to Brooklyn on the Ohio river. The Belleville and Carondelet road was not leased by appellee until June 1, 1893, and, therefore, but little consideration can be given to it in making up the estimate of earnings and expenses as found in the record. The large net income referred to is based mainly upon the earnings of the other five roads already mentioned.

It is said, that the earnings of the Belleville and Eldorado railroad, running from DuQuoin to Eldorado, when that road is taken by itself and considered separately, are not sufficient to justify the expense of running a separate passenger train from DuQuoin to Eldorado. But why should this branch be considered separately and by itself? Appellee operates its main road and its leased branches as one system, and, as thus operated, the main road and its connections or branches, yield the net yearly income of about $600,000.00 already referred to. All the divisions, which are entirely within the boundaries of the State of Illinois, are mere feeders of the main road running from East St. Louis to Belleville, which is also in Illinois; and all the leased roads above mentioned, except that running to East Carondelet, are feeders of the road running from Belleville to DuQuoin. The latter road and the Belleville and Eldorado railroad are required, by the charter of the Belleville and Eldorado Railroad Company and by the terms of its lease to, or agreement with, appellee, to be operated as one line, and such operation as one continuous line is merely the carrying out of the original intention of said charter, which provided for the operation of one continuous line from Belleville to Eldo-

rado.   It is no more proper to select the fifty miles from DuQuoin to Eldorado of this compact network of roads, all operated under one system and all contributing to the support of each other, as being deficient in the profits necessary to justify a reasonably safe and convenient operation of passenger traffic, than it would be to select any other portion of the line running from East St. Louis to DuQuoin, and charge that portion with being deficient in such profits.

If it be admitted that a railroad company is not bound to run a separate passenger train when its business is not sufficient to warrant it in doing so, we are confronted at this point with the question, whether this doctrine refers to the business done by the main road and other roads leased by it and connected with it, all of which are operated, or are required to be operated, as one line, or whether it can be made to refer to a small part of the continuous line or system which happens to run through a section of country, where the freight is not so much, and the passengers are not so many, as is the case on some other part of the line.   We are of the opinion that the whole business of the various parts operated as one line should be taken into consideration where the circumstances are such as are revealed by this record.

The duty required of a railroad company in the matter of transporting passengers is the duty to meet and supply the public wants.   These wants are measured by the business actually done, or what, it could be clearly shown, could be done if increased facilities were granted.   That there is here a public demand for passenger service is shown by the fact, that a passenger car is attached to a freight train, and that passengers are invited to ride, and do ride, upon this mixed train.   It is not contended, that appellee is not abundantly able, out of the earnings realized by it from the system controlled by it, to pay the expense of running a passenger car separately from freight cars over the Belleville and Eldorado railroad and there-

by save the traveling public from the increased danger
and inconvenience of taking passage on a freight train.
Nor does it appear, that such expense could not be easily
met by the earnings of the line running from East St. Louis
to Eldorado by way of DuQuoin.  The following language
used by the Supreme Court of the United States in *St. John*
v. *Erie Railway Co.* 22 Wall. 136, is applicable here:  "The
business of the road was a unit.   If it had been disin-
tegrated, as proposed by complainant, we apprehend it
would have been found that the co-relations of the main
stem and the branches were such, and that the expenses
and charges incident to the entire business and to those
of the several parts were so interwoven and blended that
an accurate ascertainment of the net profits of the main
line, and any of the auxiliaries taken separately from the
rest, would have been impracticable.   An ancillary road
may be short and yield but little income, yet by reason
of its reaching to coal fields, or from other local causes,
its contributions to other roads of the series may be very
large and profitable.   Whether in this case the partial
computation insisted upon could or could not have been
made, the process was one upon which the company was
neither bound nor had the right to enter."   The reports
made by appellee to the railroad and warehouse commis-
sioners for the years 1891, 1892 and 1893 show, that it has
never kept a separate account of the actual earnings or
expenditures of the road from DuQuoin to Eldorado, but
has treated the line from East St. Louis to Eldorado as
one continuous line, making no difference in its accounts
between the division from DuQuoin to Eldorado and any
other portion of the road.

     In estimating the liabilities of the Belleville and El-
dorado Railroad Company, certain indebtedness, which
is in the nature of preferred stock, is charged up as a
liability, in the accounts produced, to show that the obli-
gations of appellee are such as to relieve it from the duty
of operating the passenger train asked for.   This is mani-

festly improper, because guaranteed or preferred stock is but a dividend and not a debt, and the holder of a certificate for such stock can have no action against the company as for a debt, but his right is to a dividend. (*Taft, Trustee,* v. *H. P. & F. R. R. Co.* 8 R. I. 310; *St. John* v. *Erie Railway Co. supra;* 1 Rorer on Railroads, p. 167).

The object of incorporating railroad companies is to secure to the public increased facilities of transit from point to point, and an improved mode of carrying persons and property.  Their public character is apparent from the fact, that they are clothed with the power of taking private property through the exercise of the right of eminent domain.  Prior to the adoption of the present constitution, municipal corporations were authorized to aid in the construction of railroads by subscribing for their stock.  As matter of fact, Franklin county, through which the Belleville and Eldorado railroad passes, subscribed $150,000.00 to its construction, of which indebtedness $37,000.00 is still outstanding.  Railroads are creatures of the law, and are entrusted with the exercise of these sovereign powers to promote the public interest, and are, therefore, bound to conduct their affairs in furtherance of the public objects of their creation.  The interest of stockholders in their profits is secondary, and, in the main, subsidiary to the interest of the public.  It is in view of their public character, that the courts are authorized to determine and enforce the public duties enjoined upon them.  The duties which they owe to the State and the general public, cannot be shirked or evaded. (1 Wood on Railroads, p. 12; *Railroad Comrs.* v. *P. & O. C. Railroad Co.* 63 Me. 269).

We do not think, that there is, here, such insufficiency of business or profits as to present a valid defense to the application of the People.  The writ of *mandamus* should issue as prayed for.

The judgment of the circuit court is reversed, and the cause is remanded to that court with directions to enter

a judgment, awarding the writ in accordance with the prayer of the petition.        *Reversed and remanded.*

Subsequently, upon considering the petition for a rehearing herein, the following additional opinion was filed:

Per CURIAM: Since the rehearing was granted in this case we have given further consideration to the questions involved, and entertain the same views as those expressed in the foregoing opinion, and adhere to the same conclusion there announced. Said opinion is accordingly readopted, and it is ordered that the same be re-filed, and that the judgment heretofore entered reversing the judgment of the circuit court and remanding the cause to that court with directions to enter a judgment awarding the writ in accordance with the prayer of the petition, be re-entered as the judgment of this court.