(No. 30401.—

HENRY A. GARDNER, Trustee of the Alton Railroad Company, Appellant, *vs.* THE COMMERCE COMMISSION, Appellee.

*Opinion filed March 18, 1948—Rehearing denied May 13, 1948.*

WINSTON, STRAWN & SHAW, of Chicago, and CHAPMAN & THOMAS, of Alton, (FRANK H. TOWNER, BRYCE

L. Hamilton, and Fred J. McManus, all of Chicago, and W. H. Thomas, of Alton, of counsel,) for appellant.

George F. Barrett, Attorney General, (W. F. Gray, of counsel,) both of Springfield, for appellee.

Mr. Justice Thompson delivered the opinion of the court:

Henry A. Gardner, as Trustee of the Railroads and Properties of the Alton Railroad Company, appellant, filed a petition with the Illinois Commerce Commission on June 7, 1946, for an order authorizing discontinuance of operation of two passenger trains operated daily except Sunday on a 39-mile branch of the Alton line extending from Godfrey to Roodhouse, Illinois. After a hearing the commission denied the petition and, after denial of a rehearing, appellant appealed from the order to the circuit court of Madison County pursuant to section 68 of the Public Utilities Act. (Ill. Rev. Stat. 1945, chap. 111⅔, par. 72.) On May 6, 1947, the circuit court entered a judgment confirming the order of the commission. From that judgment appellant prosecutes this appeal direct, conformably to section 69 of the Public Utilities Act. Ill. Rev. Stat. 1945, chap. 111⅔, par. 73.

Appellant's petition before the commission alleged, in substance, that appellant is engaged in the transportation of persons and property as a common carrier by rail for hire between points in the State of Illinois, as well as between interstate points; that appellant operates a passenger train, known as No. 34, daily except Sunday, from Godfrey to Roodhouse, and a passenger train, known as No. 35, daily except Sunday, from Roodhouse to Godfrey; that the operation of the trains is and for some time has been conducted at a substantial loss, and that the public convenience and necessity do not require their continued operation.

There were no pleadings in the circuit court. Section

68 of the Public Utilities Act specifically makes the issue before such court, "the reasonableness or lawfulness" of the assailed order, and further provides that the cause "shall be tried therein without formal pleadings," and that "the appeal shall be heard on the record of the Commission as certified to by it. The findings and conclusions of the Commission on questions of fact shall be held prima facie to be true and as found by the Commission; and a rule, regulation, order or decision of the Commission shall not be set aside unless it clearly appears that the finding of the Commission was against the manifest weight of the evidence presented to or before the Commission for and against such rule, regulation, order or decision, or that the same was without the jurisdiction of the commission." Ill. Rev. Stat. 1945, chap. 111⅔, par. 72.

The record discloses the main line of the Alton extends from Chicago, Illinois, to St. Louis and Kansas City, Missouri. The main line from Kansas City and the main line from St. Louis, running north, converge at Springfield and continue on as the main line to Chicago. The particular line on which appellant desires to discontinue passenger service is a 39-mile branch connecting Godfrey on the St. Louis main line with Roodhouse on the Kansas City main line. Appellant operates two passenger trains, daily except Sunday, on the Godfrey-Roodhouse branch. The northbound train, No. 34, leaves Godfrey at 10:20 A.M. and arrives at Roodhouse at 11:40 A.M. and the southbound train, No. 35, leaves Roodhouse at 2:40 P.M. and arrives at Godfrey at 4:00 P.M.

The population of the towns served by appellant's trains, as shown by the last Federal census, is: Roodhouse, 2557; Whitehall, 3025; Berdon, 60; Carrollton, 2285; Kane, 490; Jerseyville, 4809; Delhi, 45, and Godfrey, 500.

The regular equipment ordinarily and customarily used for said trains consists of two cars, one a combination gas-motor, baggage and mail car, and one 58-seat passenger

coach. If it is necessary for the gas motor to be repaired the trains are operated with a steam engine. Both trains carry passengers, baggage, express, mail and milk. Prior to the construction of hard roads in this territory, between 1920 and 1924, the Alton Railroad operated three passenger trains daily on the Godfrey-Roodhouse branch, in each direction. With the advent of hard roads, a bus service was instituted serving this area through a subsidiary corporation known as the Alton Transportation Company. This bus line was subsequently sold to the Jacksonville Trailways Bus Line, because the railroad was unable to operate it at a profit. As more and more use was made by the public of common carrier buses and private automobiles, the passenger business on the railroad declined and it became necessary for the railroad to apply to the Commerce Commission at different times for authority to discontinue two of the three trains operated in both directions of this branch. The commission, recognizing the changed conditions, granted this authority and two of the trains were removed from service. As the passenger business on the remaining trains became less important, the schedules thereof were arranged primarily to handle mail and express business.

The total revenue from the operation of said trains for the year 1945 was as follows: passenger, $3571.23; mail, $4268.72; express, $4122.70, and miscellaneous, $223.66, making a total of $12,186.31. The total expense, as shown by appellant for such year, was $20,543.52, leaving a deficit for the year, according to appellant's method of accounting, $8357.21. For the months of January, February, March April, May, and June, 1946, the total revenue from the operation of the trains was $3845.37, while the expense of operation, in accordance with appellant's accounting methods, was $13,893.37, leaving a deficit for such months of $10,048. During such five-month period of 1946 said trains were steam operated for the months of January,

February, March, and April, and for two round trips in June the balance of the operation during June was by motor-car power. An appreciable and substantial difference in cost is shown between the motor power and steam power operation of these trains. For the month of January, 1945, a motor power operation cost $1559.95, while for the month of December, 1945, a steam power operation cost $3108.88, an increase in cost of steam power over motor power operation of $1548.93. The difference in the cost of the two kinds of operation, using the month of April, 1946, a steam power operation, and the month of April, 1945, a motor power operation, was $1493.96, being the amount of increase in cost of steam operation over motor power operation for such months.

Common carrier passenger service is available in all of the communities served by the said trains. U. S. Route 67 parallels the line of the Alton between Godfrey and Roodhouse, and the Jacksonville Trailways operates five motor buses over this route in each direction daily. These buses serve all of the communities served by the appellant, and the fares charged are comparable to those of appellant. Many of the people in the communities served by appellant's trains travel in their own automobiles or by bus. The principal business and shopping center to which they travel is St. Louis, and they do not use appellant's service for such trips because they cannot travel to and return from St. Louis by rail on the same day. The principal traffic handled on these trains being mail and express, the schedules of the trains have therefore been adjusted to afford the most convenient service for the handling of this traffic rather than the passenger traffic which produces less than one-third of the total revenue.

Objections to discontinuance of the above-mentioned passenger service was promptly made by more than 150 patrons of the road and citizens of Green County alone, these objectors being business and professional men, local

and municipal officers, as well as other citizens. In addition to the above objectors counsel appeared on behalf of the cities of Carrollton and Jerseyville, the Jerseyville Chamber of Commerce, the Commercial Group of Jerseyville, the city of Godfrey, Godfrey Township, the city of Alton, the city of Roodhouse, and other civic organizations of the cities and villages affected. Also, appearances were entered for the Order of Railroad Conductors, Brotherhood of Railroad Trainmen, Brotherhood of Railroad Clerks, Brotherhood of Locomotive Engineers, Brotherhood of Locomotive Firemen and Enginemen, and Brotherhood of Railroad Conductors of the Alton system.

It is apparent that appellant's position is that the particular part of the passenger service on the Godfrey-Roodhouse line is being operated at a loss; that the public convenience and necessity of the citizens between Godfrey and Roodhouse do not require the continuance of passenger service between these two points and that bus service is adequate to take care of the public needs; that the few passengers riding upon the trains in question indicate the desire of the public not to use such service; that the number of passengers carried by the buses is many and for that reason there is an absence of public convenience and necessity in the operation of such passenger service.

On the other hand, the objectors to the discontinuance of the service contend that appellant is bringing about self-serving conditions by making it impractical if not impossible for the public to use its present passenger service by reason of (a) difficult time schedules, (b) failure to keep schedules, (c) lack of sanitation, (d) lack of comfort and convenience to the passengers who are compelled to accept the service, and, (e) establishing a general program for the purpose of driving its patrons to other means of travel.

It is urged by appellee that there is very little dispute upon the question of very poor service being offered by the appellant, but the big dispute concerns the question of

whether or not the appellant has fairly and honestly presented to the commission figures by which it may be determined what, if any, loss the company has sustained by reason of furnishing the service as above mentioned; that appellant has used the actual receipts from the alleged poorly equipped and poorly scheduled service as against what is claimed by the objectors to be a fictitious formula in order to ascertain the maintenance of the service in question; that the appellant offered figures upon the traceable-in-pocket receipts of the branch road to establish the revenues, and the "entire system" rule to establish cost of service and net profit or loss.

Upon the evidence offered and the figures submitted by both appellant and appellee, the commission concluded that discontinuance of operation of the two trains involved would result in considerable inconvenience and hardship to residents of the communities served by the trains; that public convenience and necessity require the continued operation of the trains, and that it would not be in the public interest to grant the prayer of the petition. The order entered by the commission denied appellant's petition for authority to discontinue such operation.

The petition filed here under section 49a of the Public Utilities Act, (Ill. Rev. Stat. 1945, chap. 111⅔, par. 49a,) seeks the discontinuance of service which appellant is rendering, and presents the question whether public convenience and necessity will permit the abandonment or discontinuance of such service. *Illinois Central Railroad Co.* v. *Commerce Com.* 397 Ill. 323; *Illinois Central Railroad Co.* v. *Commerce Com.* 375 Ill. 585.

It necessarily follows that appellant must allege and prove, under his petition, by competent evidence sufficient facts which would justify abandonment of the passenger service. It is contended the order of the Commerce Commission is based on matters which are irrelevant to the issue of public convenience and necessity and that weight was

given to such matters by the commission. It is pointed out that the finding of the commission "that considerable inconvenience and hardship would result to residents of the communities now served by the trains in question if these trains be discontinued and substitute service for registered mail, regular mail, baggage and milk be inaugurated," indicates that the commission gave weight to handling of mail traffic in reaching its final conclusions. It is true the commission made a finding that "public convenience and necessity require the continuance in operation of said trains," but it is not disclosed that the finding was by any means based on the question of inconvenience by substituting service for registered mail, etc.

Appellant contends that in handling the mail traffic it does not act as a common carrier and for that reason, alone, the service involved is not embraced in the jurisdiction given to the commission by section 49a of the Public Utilities Act; that the handling of the mail is a function of the government of the United States and the United States Post Office has exclusive jurisdiction over the quality and quantity of service to be rendered. Appellant cites the case of *Atchison, Topeka & Santa Fe Railway Co.* v. *United States,* 225 U. S. 640, 32 Sup. Ct. 702, wherein that court discusses the relationship of the railroad company to the government in the handling of mail and wherein, at page 703, it said: "For public policy requires that the mail should be carried subject to postal regulations, and that the Department and not the railroad, should, in the absence of a contract, determine what service was needed, and under what conditions it should be performed. The company in carrying the mails was not handling freight, nor was it acting as a common carrier with corresponding rights and liabilities, but in this respect it was serving as an agency of the government and as much subject to the laws and regulations as every other branch of the Post Office."

The case of *Cleveland, Cincinnati, Chicago and St. Louis Railway Co.* v. *Industrial Com.* 294 Ill. 374, is also cited by appellant, and, quoting from page 376, it is said: "The railroad company is not the real transporter of the mail but only transports it as an agent of the government, and it has never been considered that the relation between the government and the railroad company is that of a common carrier."

It is appellant's position, by the citation of authorities, that in the handling of mail traffic appellant does not act as a common carrier and for that reason the service involved is not embraced within the jurisdiction given to the commission by section 49a of the Public Utilities Act, and that the commission erred in giving consideration and weight to the effect which the discontinuance of the service might have upon the handling of United States mail to and from the communities served by the trains.

We find no fault with the holdings in the above cases, but they have little bearing on the question here. Even though the commission had no control over the mail, it might work some inconvenience to the public by the abandonment of said service which carried with it loss of mail facilities. In our judgment, under the circumstances here, the discontinuance of the service might cause some inconvenience to the public, not only in handling the mail, but in the handling of baggage and milk. Certainly it could not be said that the handling of milk, as set out in this particular clause in the findings, would not be a proper basis for determination as to the convenience and necessity of the public.

It is further contended by appellant that the fact that the commission found that the adjusted system passenger earnings for the year 1945, after deductions for fixed charges, was $126,996, indicates that it must have given weight to appellant's system earnings on passenger traffic in reaching its final conclusions, and that the commission plainly erred

in giving consideration to the earnings on all passenger traffic carried on appellant's railroad. In support of this contention, the cases of *Illinois Central Railroad Co.* v. *Commerce Com.* 397 Ill. 323, and *Illinois Central Railroad Co.* v. *Commerce Com.* 397 Ill. 399, are cited and quoted from at considerable length.

We cannot, however, agree with appellant that anything said in these opinions would prevent the commission taking into consideration the earnings of the system, favorable or unfavorable, in discontinuing passenger service on a line which, although it is a branch, necessarily is a part of the system. We held in the *Illinois Central case,* 397 Ill. 323, referring to what was said in *People ex rel. Cantrell* v. *St. Louis, Alton and Terre Haute Railroad Co.* 176 Ill. 512, "The financial condition of the entire system might well be taken into consideration as a factor to be considered in arriving at just where the balance lies in weighing the question of public convenience and necessity. Many other factors are also to be considered, namely, the volume of business done at the station, the number of people to be accommodated, the present facilities, proximity to other agency stations, and the cost of furnishing such services." It was also said in that case, "Assuming the financial structure of the entire system to be in a most favorable condition, this in itself would not justify the continuation of an economic waste occasioned by the retention of an agency station when not in the interest of public necessity and convenience."

We hardly see how it could be claimed from such holding that the commission would not have a right to take into consideration as a factor the financial condition of the entire system in weighing the question of public necessity and convenience. We held in the case of *People ex rel. Cantrell* v. *St. Louis, Alton and Terre Haute Railroad Co.* 176 Ill. 512, at page 530, "If it be admitted that a railroad company is not bound to run a separate passenger train

when its business is not sufficient to warrant it in doing so, we are confronted at this point with the question, whether this doctrine refers to the business done by the main road and other roads leased by it and connected with it, all of which are operated, or are required to be operated, as one line, or whether it can be made to refer to a small part of the continuous line or system which happens to run through a section of country, where the freight is not so much, and the passengers are not so many, as is the case on some other part of the line. We are of the opinion that the whole business of the various parts operated as one line should be taken into consideration where the circumstances are such as are revealed by this record. The duty required of a railroad company in the matter of transporting passengers is the duty to meet and supply the public wants. These wants are measured by the business actually done, or what, it could be clearly shown, could be done if increased facilities were granted."

We think the statement there made "that the wants are measured by the business actually done or what, it could be clearly shown, could be done if increased facilities were granted," is particularly pertinent in the instant case. We think a fair statement of the testimony reveals that some of the loss in passenger traffic was due to the irregularity of the service, the condition of the coaches, which were uncomfortable and unsanitary, and that the schedule of time was so fixed that passengers desiring to go to St. Louis required two days travel to go and return. Surely, as it appears here, there has been no attempt to improve the service, but from the inception, the operation of a bus line by the company, which was later transferred to other parties, did not indicate an attempt on their part to get results from corrected facilities on their own lines. A railroad company is, in an important sense, a public corporation. It depends upon the public for its franchises to exist and carry on business, and in consideration of such franchise

it assumes and must perform certain duties and obligations for the public. Among them, as a general rule, is the duty of maintaining its entire line of road in a reasonable, safe and operative condition, and, for a fair consideration, to carry passengers and freight over it at all reasonable times. To permit a railroad to allow its equipment to become so depleted and its schedules on its branch lines to be so irregular as to make the use of its facilities uncomfortable and distasteful, which causes the public to seek other modes of travel, would not, in our judgment, be giving to the public the service under the rule of convenience and necessity; and by reason of such inadequate and improper service justify an abandonment by using as a factor the loss of business under such circumstances.

It is disclosed in the instant case that this line on which it desired to abandon passenger service runs through many communities and towns, one with a population of over 4000; that it connects the two main lines of the Alton system giving an outlet to St. Louis, Chicago and Kansas City, the main lines, as shown in the instant case, being highly profitable. While our Commerce Commission, in its operation, is controlled by statute and the decisions of our State courts, our attention is directed to a statement of the Wisconsin Railroad Commission in the case of *Nelson* v. *Northern P. R. Co.* (1912) 8 Wis. R. C. 685, that "Every part of a railroad system cannot be expected to be profitable. There are many short lines acting as feeders to main lines which could not be operated independently of the main lines. Therefore in determining the reasonableness of any branch line service, the relation of the branch line to the system as a whole, the needs of the public tributary branch, the character and volume of traffic, both present and prospective, the cost of operation and its effect upon the revenues of the entire system, must be considered and every factor given such weight as, in the

light of all the circumstances, the situation warrants." 123 A.L.R. 926.

The appellant argues there is no support in the record for the assertion of the appellee that the passenger coaches are unsanitary and uncomfortable, and that the record shows without dispute the present train is spic and span, but admits that the trains are not always operated on time. We think that in the determination of such questions we must depend on the findings of the commission and whether or not its findings are against the manifest weight of the evidence. Apparently no such findings were made. Considerable discussion in the briefs revolves around the question as to whether or not, in determining the economic waste, or the loss in the operation of the trains, a proper formula was used as to the earnings, and much criticism is levelled at the accounting methods used by the appellant in determining the revenues and expenses in the operation of the trains in question. The appellee contends that an examination of the record discloses that appellant, notwithstanding that it has the burden of proving the absence of "convenience and necessity," in addition to its burden to prove "economic waste," appears to be intent on avoiding the required actual and specific proof by its own rules. It is contended the appellant has adopted a new formula; that it does not use the financial structure of the entire system in order to arrive at the question of economic waste, neither does it use the formula of that specific branch of the system and submit figures thereon for the information of the Commerce Commission. On the contrary, it has created a new formula by mixing both rules and taking a part of each to make the figures appear to sustain its petition when in truth and in fact they do not. Had it used the entire system formula, the result would have shown a profit. Had it used the local branch bookkeeping, the results would have shown either profits or such

minor deficit as would not have justified the destruction of passenger service to the injury of many thousand people in the rural districts and 14,000 people in the towns and villages; that it attempts to make its proof by using the revenues paid in on the branch of railroad in question and instead of showing the actual cost of operation of service on this branch, it has allocated the cost by apportioning the overhead train-mile unit as compared with the same unit on the entire system. In other words, it is suggested the upkeep of the Abraham Lincoln and the Ann Rutledge, with their streamlined locomotives, is charged against this little branch of the road by the same train-mile each, as is charged against a compartment gasoline motored tractor and coach, which is used by appellant on its branch line.

Appellant answers this contention by insisting that it is not necessary for it to use a formula of the specific branch of the system based upon local branch bookkeeping in order that the commission might determine whether the operation of these trains was being conducted at a loss. The case of *Atchison, Topeka and Santa Fe Railway Co. v. Commerce Com.* 397 Ill. 406, is cited to support its contention that the finding of the commission to the effect that a formula used by the railroad was arbitrary was not in harmony with recent decisions of this court, and further stated there that the disposition of the case did not necessarily depend upon the use of a formula. Appellant also cites the case of *New York v. United States*, 331 U.S. 284, where the court said, "the determination of transportation costs and their allocation among various types of traffic is not a mere mathematical exercise. Like other problems in cost accounting, it involves the exercise of judgment born of intimate knowledge of the particular activity and the making of adjustments and qualifications too subtle for the uninitiated."

To attempt to reconcile the various formulas and the

degree of proof to be afforded when they are presented by skilled railroad cost accountants might present some difficulty of solution. It would seem however, as a practical matter on a branch line of this kind, that some effort should or could have been made to offer proof which would be more comparable on a line of this character, which would tend to show, at least, the actual cost of operation. But, in any event, such evidence is to be heard by the commission along with other evidence for the purpose of determining convenience and necessity or economic waste. It is well established by this court that no set rule can be used to determine whether or not public convenience and necessity require a given service to be performed or dispensed with, but the facts in each case must be separately considered and from those facts the question is to be determined, the doctrine of convenience and necessity being a relative or elastic theory rather than an abstract or absolute rule. The facts in each case must be separately considered and from those facts it must be determined whether or not public convenience and necessity require a given service to be performed or dispensed with. It is a further rule that the burden of proof is upon the person who seeks to establish an absence of "convenience and necessity," and in this case the burden of proof is upon the appellant to prove the allegations of its petition. We said in the case of *O'Keefe* v. *Chicago Railways Co.* 354 Ill. 645, "Unless manifestly against the evidence, the finding of the commission within the scope of its authority is conclusive on the reviewing courts, (*Public Utilities Com.* v. *Smith,* 298 Ill. 151; *Wabash, Chester and Western Railroad Co.* v. *Commerce Com.* 309 Ill. 412;) as we must accord to its decisions the strength due to the judgment of a tribunal appointed by law and informed by experience. *Public Utilities Com.* v. *Springfield Gas Co.* 291 Ill. 209."

We have gone over the findings in this case and the evidence offered in support thereof and are of the opinion

138

they are sufficient to support the order of the commission. We are, therefore, of the opinion that appellant has not established the burden of proof, and that there is a substantial basis for the order of the commission in denying appellant's petition to discontinue the operation of its trains, now being operated between Godfrey and Roodhouse, Illinois.

The judgment of the circuit court, approving the order of the Commerce Commission, is affirmed.

*Judgment affirmed.*