THE STATE OF KANSAS, *ex rel. Carr W. Taylor, as Attorney for the Board of Railroad Commissioners, and ex rel. C. C. Coleman, as Attorney-general,* v. THE MISSOURI PACIFIC RAILWAY COMPANY.*

No. 14,999.   (92 Pac. 606.)

SYLLABUS BY THE COURT.

1. CONSTITUTIONAL LAW—*Act Creating Board of Railroad Commissioners—Separation of Governmental Departments.* The statute creating a board of railroad commissioners (Laws 1901, ch. 286; Gen. Stat. 1901, ch. 84, art. 3) and the acts supplementary and amendatory thereto (Laws 1903, ch. 391; Laws 1905, ch. 340) are not in violation of the constitutional requirement that the legislative, executive and judicial departments of government shall be kept separate.

2. ——— *Delegation of Legislative Powers.* The act does not delegate to the board of railroad commissioners legislative powers. The legislature in the exercise of its power to regulate and control public corporations, such as common carriers, may delegate to a board of railroad commissioners certain functions administrative in character which cannot well be performed by the legislature itself.

3. ——— *Delegation of Executive or Judicial Powers.* The act does not confer upon the board executive or judicial powers, although the board is required to exercise judgment and discretion and to make orders for the regulation and control of railroads and other common carriers.

* Pending in the supreme court of the United States on a writ of error allowed November 18, 1907.

4. ————— *Legislative Jurisdiction—Creation of Board of Railroad Commissioners.* The act is not invalid because the constitution does not specifically provide for the creation of a board of railroad commissioners. The subjects upon which the legislature may enact laws are not enumerated in the constitution.

5. ————— *Power of the Legislature to Regulate and Control Railroads.* The legislature has the power to regulate and control the operation of railroads. The question of the extent of the control and regulation must be left to the legislature to determine, subject always to the constitutional guaranties for the protection of property.

6. ————— *Commerce—Regulation.* The act creating such board applies solely to the business of railroads within the state, and is not designed to affect, and does not apply to or regulate, interstate commerce.

7. ————— *Due Process of Law.* Nor is the act in question unconstitutional upon the ground that it provides for taking the property of persons or corporations without due process of law.

8. ————— *Notice—Appearance—Due Process of Law.* Defendant having been notified of a hearing before the board of railroad commissioners upon a complaint filed with such board, and having appeared before the board and participated in such hearing, cannot claim that an order issued by the board after such hearing is not due process of law.

9. ————— *Jurisdiction of the Supreme Court — Mandamus — Delegation of Powers.* This court has jurisdiction of original proceedings in mandamus to compel obedience to an order made by the board of railroad commissioners. The power which the act confers upon the court is not a legislative or non-judicial power. It is a judicial power simply. In such a proceeding the only question to be determined by this court is whether such order is reasonable.

10. RAILROADS—*Order of Board of Railroad Commissioners— Conclusiveness.* The provisions of section 11 of chapter 340, Laws of 1905, making certain orders of the board conclusive after the lapse of thirty days from the time such orders shall have been made is a rule of evidence and not a limitation upon the right of a defendant railroad company to offer evidence in defense of an action in mandamus to compel obedience to an order of the board. Defendant is not estopped in this action from offering evidence to show that the order of the board is unreasonable by the failure to avail itself of the right to commence an action to vacate such order within thirty days.

11. ——— *Separate Passenger Service—Reasonableness of Order.* The order of the board requiring defendant to operate separate passenger-trains is not unreasonable upon its face.

12. MANDAMUS—*Order of Railroad Commissioners—Reasonableness—Burden of Proof.* In mandamus proceedings in this court to compel obedience to an order of the board of railroad commissioners the order of the board is *prima facie* reasonable, and the burden of proof is upon defendant to establish its unreasonableness.

13. ——— *Evidence Insufficient to Overcome Presumption of Reasonableness.* Defendant failed to produce sufficient evidence to overcome the *prima facie* presumption that such order is reasonable.

14. CONSTITUTIONAL LAW—*Interstate Commerce—Separate Passenger Service.* The order of the board requiring defendant to operate separate passenger service within the state is in the exercise of its police power to enforce local regulations necessary for the convenience, safety and comfort of the public, and is not an attempt to regulate interstate commerce, nor does it directly cast a burden upon such commerce.

Original proceeding in mandamus. Opinion filed November 9, 1907. Writ allowed.

*Carr W. Taylor, S. S. Ashbaugh,* and *G. F. Grattan,* respectively, attorneys for the board of railroad commissioners, and *Fred S. Jackson,* attorney-general, for The State; *A. E. Helm,* and *John W. Poore,* of counsel.

*B. P. Waggener,* for defendant.

The opinion of the court was delivered by

PORTER, J.: This is an original proceeding in mandamus to compel defendant to obey an order of the board of railroad commissioners requiring it to install and operate a separate passenger-train service on the Madison branch of its railway from the state line between Kansas and Missouri to Madison, Kan. The order of the board of railroad commissioners was made on the 7th day of December, 1905, after a regular hearing previously held at Blue Mound, Kan. The hearing was upon a written complaint filed with the board, to

which defendant filed its answer. Defendant having refused to comply with the order, this proceeding was brought and the alternative writ issued May 24, 1906.

What is known as the Madison branch of defendant's railroad was originally the Interstate railroad, chartered in 1885 by the state as a common carrier, under the name of the Interstate Railroad Company. Afterward, in 1891, it was consolidated with eleven other roads, and became part of the Kansas, Colorado & Pacific Railway Company. It has been operated as a part of the Missouri Pacific Railway Company for a number of years.

To the alternative writ an answer was filed which denies that the company operated the Madison branch as a line of road wholly within the state of Kansas, and alleges that said branch is a part of the Missouri Pacific general system; that defendant maintains terminal facilities for the branch at Butler, Mo., twenty miles east of the Kansas state line, where the branch connects with the main line of defendant's railroad; that the company has no terminal facilities near the state line within the state of Kansas, and that the branch road cannot be operated as a road within the state of Kansas without such terminal facilities, to maintain which would involve the company in ruinous expense. It also alleges that the order is unreasonable and confiscatory and that the company cannot comply with it without great financial loss; that the entire revenue of the road within the state of Kansas, including passenger and freight business, is insufficient to meet the expense and cost of operating the road within the state; that from July 1, 1903, to April 30, 1905, it maintained separate passenger-train service upon this branch, but was obliged to abandon the same and return to the mixed passenger and freight service because the total receipts of passenger and freight business during that period proved wholly insufficient to meet the expenses of operation. It further alleges that compliance with the

order of the board would compel defendant to divert its revenues from other lines and parts of its system outside the state of Kansas to the maintenance of separate passenger-train service in the state, and that the extent of such additional cost would amount to a confiscation of its property.

After the issues were joined the Honorable T. F. Garver was appointed referee. His report was filed May 27, 1907, and embraced findings of fact and conclusions of law. The referee found as a conclusion of law that the peremptory writ should not be allowed. Special reference will be made to these findings in another part of the opinion.

We have not attempted to state the allegations and averments of the alternative writ or those of the answer, except in general terms. There is, however, no question arising on the pleadings except that the state contends that it is entitled to judgment thereon because it appears that the defendant railway company failed to commence an action to vacate and set aside the order of the board within thirty days from the time such order was made, and that the order of the board thereby became a final order barring the railway company from all right to any defense to the alternative writ.

To this contention we do not agree. Section 11 of chapter 340, Laws of 1905, amending the general railroad law, provides that certain determinations and orders of the board shall be *prima facie* evidence in any action where they are offered as evidence—that is, *prima facie* evidence "of the reasonableness and justness of the classifications, rates and charges involved therein and of all other matters therein found and determined." It also provides that "after the lapse of thirty days from the time such determinations and orders shall be made, no suit then pending to set the same aside, and they remaining in full force and effect, such determinations and orders shall be held to be conclusive as to the matters involved therein." We understand

these provisions to apply to certified copies of rates, rules, regulations and orders which section 11 authorizes the board to furnish upon the application of any person interested. The provision is a rule of evidence and not a limitation of the right of the railway company to be heard in an action brought under section 5998 of the General Statutes of 1901, as this action is brought.

Section 5998 makes it the duty of every railroad company to obey the reasonable orders of the board, and authorizes mandamus proceedings in the name of the state, on the relation of any person interested, to compel compliance and obedience to such order. This and the following section (5999) must be construed together as creating the court procedure. The railroad company, if dissatisfied with any order or decision of the board, is given the right within thirty days thereafter to bring an action against the board in any court of competent jurisdiction to have the same vacated. Section 5999 also provides that the institution of such action by the railroad company shall in no way interfere with or prejudice the rights of the party or parties in interest from availing themselves of the remedies provided in the preceding section, and that during these thirty days no penalties or forfeitures shall attach or accrue on account of the failure of the company to comply with the order until the validity of the order has been finally determined by the supreme court in any proceeding in which the railroad company is a party. When both actions are pending at the same time the supreme court is authorized to stay all proceedings in the district court until the final determination of the matter in the supreme court.

Had the legislature intended to provide that the failure of the railroad company to institute proceedings to vacate an order should summarily cut off the right of the company to make any defense to the mandamus proceedings it certainly would have used language appropriate to manifest that intention.

We are aided in this construction by the fact that section 5998, which authorizes the mandamus proceeding, also provides that the orders and determinations of the board shall be *prima facie* evidence of the matters therein stated and found, and particularly by the further provision that "the court may direct the railroad company affected thereby to comply with any part of any rule, order or regulation of the board, and may hold any part of the same unreasonable, and refuse to enforce such part, without affecting the part found to be reasonable and just." It must be obvious that this provision contemplates a trial in the supreme court of the question of the reasonableness of the order, and that the provision subsequently adopted by the amendment of 1905 has no reference to this kind of an action.

The defendant railway company therefore was not estopped from offering proof of its defense in this action by its failure to avail itself of the right to commence an action to vacate the order of the board within thirty days.

Defendant attacks the constitutionality of the law creating the board of railroad commissioners upon the ground that it attempts to delegate to the board legislative authority. The exact question presented here has been decided so often by the courts of last resort, the subject has been so exhaustively discussed and elaborated, and the field for original comment or suggestion has been reduced to such narrow limits, that very little is left but to repeat what others have said. In a majority of the states of the Union the legislatures have created commissions and conferred upon them the power to regulate and control the operation of common carriers, to fix rates and schedules for the transportation of passengers and freight, to hear and determine complaints of the people against the carrier and to act thereon, and the power to create such agencies, and to confer upon them these powers, has

been repeatedly recognized and upheld by the supreme court of the United States.

Our constitution contemplates the complete separation of the three governmental powers as clearly as though it so declared in express terms. (*In re Sims, Petitioner,* 54 Kan. 1, 37 Pac. 135, 25 L. R. A. 110, 45 Am. St. Rep. 261; *The State v. Johnson,* 61 Kan. 803, 60 Pac. 1068, 49 L. R. A. 662; *In re Davis,* 58 Kan. 368, 49 Pac. 160.) The constitution vests all legislative power in a legislature, consisting of a senate and a house of representatives. It cannot be doubted that the legislature is not authorized to delegate this legislative power. It may not confer upon any person, board or commission the power of determining what the law shall be. These propositions are elementary. Notwithstanding these well-established maxims, the separation of the powers of government is complete only in theory. In *In re Sims, supra,* Mr. Justice Johnston, in concurring, used this language:

"It is highly important to separate the legislative, judicial and executive functions, and that the officer of one department should not exercise the functions conferred upon another. Under our system, however, the absolute independence of the departments and the complete separation of the powers is impracticable, and was not intended." (Page 11.)

As early as 1871, in *Coleman v. Newby,* 7 Kan. 82, Mr. Justice Valentine said:

"While the legislature possesses all of the legislative power of the state, and while it is true that they cannot delegate any portion of that power to any other body, tribunal, or person, yet it is generally found impracticable for them to exercise this power in detail. They may do so if they choose, or they may enact general provisions, and leave those who are to act under these general provisions to use their discretion in filling up the details. They may mark out the great outlines, and leave those who are to act within these outlines to use their discretion in carrying out the minor regulations." (Page 88.)

And in *Chicago & N. W. Ry. Co. v. Dey,* 35 Fed. 866,

1 L. R. A. 744, Mr. Justice Brewer commented as follows upon the distinction theoretically and as applied to legislative acts conferring administrative powers:

"*Third.* While, in a general sense, following the language of the supreme court, it must be conceded that the power to fix rates is legislative, yet the line of demarcation between legislative and administrative functions is not always easily discerned. The one runs into the other. The law-books are full of statutes unquestionably valid in which the legislature has been content to simply establish rules and principles, leaving execution and details to other officers. Here it has declared that rates shall be reasonable and just, and committed what is, partially at least, the mere administration of that law to the railroad commissioners. Suppose, instead of a general declaration that rates should be reasonable and just, it had ordered that the rates should be so fixed as to secure to the carrier above the cost of carriage three per cent. upon the money invested in the means of transportation, and then committed to the board of railroad commissioners the fixing of a schedule to carry this rule into effect, would not the functions thus vested in such a board be strictly administrative? While, of course, the cases are not exactly parallel, yet the illustration suggests how closely administrative functions press upon legislative power, and enforces the conviction that that which partakes so largely of mere administration should not hastily be declared an unconstitutional delegation of legislative power. *Fourth.* The reasonableness of a rate changes with the changed condition of circumstances. That which would be fair and reasonable to-day, six months or a year hence may be either too high or too low. The legislature convenes only at stated periods; in this state once in two years. Justice will be more likely done if this power of fixing rates is vested in a body of continual session than if left with one meeting only at stated and long intervals. Such a power can change rates at any time, and thus meet the changing conditions of circumstances. While, of course, the argument from inconvenience cannot be pushed too far, yet it is certainly a matter of inquiry whether in the increasing complexity of our civilization, our social and business relations, the power of the legislature to give increased extent to administrative functions must not be recognized." (Page 874.)

In *The State v. Johnson,* 61 Kan. 803, 60 Pac. 1068, 49 L. R. A. 662, the act creating a court of visitation was held to be unconstitutional and void for the reason that in the powers conferred on that tribunal legislative, judicial and administrative functions were so commingled and interwoven as to violate the constitutional requirement that the three departments of state be kept separate. It was said, however, in the opinion:

"Legislative power to prescribe rates which railway corporations may charge for carrying freight or passengers exists beyond question, and its exercise has been uniformly upheld by the courts. And this power the lawmakers may delegate to boards or commissioners, which has been frequently done. (*Stone v. Farmers' Loan & Trust Co.,* 116 U. S. 307, 6 Sup. Ct. 334, 388, 1191, 29 L. Ed. 636.) The extent of the power is curtailed only by limitations placed upon it by the courts in the application of certain constitutional guaranties prohibiting the destruction of property rights vested in the owners of the railway. (*Chicago &c. Railway Co. v. Minnesota,* 134 U. S. 418, 10 Sup. Ct. 462, 702, 33 L. Ed. 970.)" (Page 816.)

The power conferred is uniformly held to be administrative in its character, though the term "executive" has been used by the supreme court of the United States in defining it. It has, however, no relation to, or dependence upon, the executive power spoken of as one of the three governmental powers, for its function is that of carrying into effect the legislative will, and in its operation it is a part of the legislative act. This is the doctrine of the *Railroad Commission Cases,* 116 U. S. 307, 6 Sup. Ct. 334, 348, 349, 29 L. Ed. 636, which was approved in *Reagan v. Farmers' Loan & Trust Co.,* 154 U. S. 362, 14 Sup. Ct. 1047, 38 L. Ed. 1014. The language of Mr. Justice Brewer in the latter case is as follows:

"Such a commission is merely an administrative board created by the state for carrying into effect the will of the state as expressed by its legislation. *Railroad Commission Cases,* 116 U. S. 307, 6 Sup. Ct. 334,

348, 349, 29 L. Ed. 636. No valid objection, there-
fore, can be made on account of the general features
of this act; those by which the state has created the
railroad commission and entrusted it with the duty of
prescribing rates of fares and freights as well as other
regulations for the management of the railroads of the
state." (Page 394.)

Commenting upon the same objections to a similar
law the supreme court of Illinois, in the case of *C., B.
& Q. R. R. Co. v. Jones,* 149 Ill. 361, 37 N. E. 247, 24
L. R. A. 141, 41 Am. St. Rep. 278, used the following
language:

"The act of 1873 is said to be invalid because, instead
of establishing reasonable maximum rates of charges,
it is supposed to delegate the power to establish such
rates to the railroad and warehouse commissioners. It
has been held in a number of cases that statutes which
create boards of commissioners and authorize them to
make schedules of rates for railroad companies are not
invalid for the reason here urged. The doctrine of
these cases is that the functions of such boards are
administrative rather than legislative; that the author-
ity conferred upon them relates merely to the execution
of the law; that a grant of legislative power to do a
certain thing carries with it the power to use all proper
and necessary means to accomplish the end, and that,
as the reasonableness of rates changes with circum-
stances and legislatures cannot be continuously in ses-
sion, the requirement that the statute itself shall fix
the charges might preclude the legislature from the
use of the agencies necessary to perform the duty im-
posed upon it by the constitution; in short, that the
legislature may authorize others to do things which it
might properly, but cannot conveniently or advanta-
geously, do itself." (Page 378.)

The supreme court of the United States, in a very
recent case, has had occasion to pass upon the same
question as applied to acts of congress conferring ad-
ministrative functions upon individual officers. In
*Union Bridge Co. v. United States,* 204 U. S. 364, 27
Sup. Ct. 367, 51 L. Ed. 523, the question arose over the
validity of the river and harbor act of 1899, by which

congress conferred upon the secretary of war the power
to determine when any railroad or other bridge over
a navigable stream constituted an obstruction to
navigation, and to notify the owners thereof to alter
or remove the same. The question to be determined
was whether the act was a violation of the constitu-
tion of the United States as delegating legislative and
judicial powers to the head of an executive department
of the government. The opinion reviews the authori-
ties and, at page 382, quotes from *Field v. Clark*, 143
U. S. 649, 693, 12 Sup. Ct. 495, 36 L. Ed. 294, as
follows:

" 'The true distinction,' as Judge Ranney, speaking
for the supreme court of Ohio, has well said, 'is be-
tween the delegation of power to make the law, which
necessarily involves a discretion as to what it shall be,
and conferring authority or discretion as to its execu-
tion, to be exercised under and in pursuance of the law.
The first cannot be done; to the latter no valid objec-
tion can be made.' *Cincinnati, Wilmington &c. Rail-
road v. Commissioners*, 1 Ohio St. 77. In *Moers v. City
of Reading*, 21 Pa. St. 188, 202, the language of the
court was: 'Half the statutes on our books are in the
alternative, depending on the discretion of some per-
son or persons to whom is confided the duty of deter-
mining whether the proper occasion exists for exe-
cuting them. But it cannot be said that the exercise
of such discretion is the making of the law.' So, in
*Locke's Appeal*, 72 Pa. St. 491, 498, 13 Am. Rep. 716:
'To assert that a law is less than a law, because it is
made to depend on a future event or act, is to rob the
legislature of the power to act wisely for the public
welfare whenever a law is passed relating to a state
of affairs not yet developed, or to things future and
impossible to fully know.' The proper distinction the
court said was this: 'The legislature cannot delegate
its power to make a law; but it can make a law to dele-
gate a power to determine some fact or state of things
upon which the law makes, or intends to make, its own
action depend. To deny this would be to stop the
wheels of government. There are many things upon
which wise and useful legislation must depend which
cannot be known to the lawmaking power, and must,

therefore, be a subject of inquiry and determination outside of the halls of legislation.'"

Counsel for defendant calls particular attention to the case of *Chicago &c. Railway Co. v. Minnesota*, 134 U. S. 418, 10 Sup. Ct. 702, 33 L. Ed. 970, where the Minnesota law creating a railroad commission was held to be in conflict with the constitution of the United States. The particular reason why the Minnesota statute was held to be unconstitutional does not apply to this case. The Minnesota court construed the act to mean that the rates recommended by the commission should be not merely *prima facie* equal and reasonable, but final and conclusive as to what were reasonable and equal charges, and held that the law neither contemplated nor allowed any issue to be made or inquiry to be had as to their equality or reasonableness in fact, and that in a proceeding for mandamus under the statute there was no fact to traverse except the violation of the law in not complying with the orders of the commission. The supreme court declared that it was bound by the construction which the Minnesota court had placed upon the statute, and that so construed the act deprived the railroad company of its right to a judicial investigation by due process of law. No such objection can be urged to the Kansas act. In a specially concurring opinion in that case Mr. Justice Miller laid down certain fundamental propositions; among others, the following:

"1. In regard to the business of common carriers limited to points within a single state, that state has the legislative power to establish the rates of compensation for such carriage.

"2. The power which the legislature has to do this can be exercised through a commission which it may authorize to act in the matter, such as the one appointed by the legislature of Minnesota by the act now under consideration." (Page 459.)

The following additional authorities, and many others that might be cited, sustain the doctrine that while

the legislature may not delegate its strictly legislative powers it may delegate authority to perform certain functions which are administrative in character and which cannot well be performed by the legislature itself: *C. W. & Z. Rail Road Co. v. Commissioners of Clinton County*, 1 Ohio St. 77; *Tilley v. The Railroad Commissioners*, 4 Woods (U. S. C. C.) 427, 5 Fed. 641; *Georgia Railroad et al. v. Smith et al., Railroad Commissioners, et al.*, 70 Ga. 694; *Express Co. v. Railroad*, 111 N. C. 463, 16 S. E. 393; *State. v. Chicago, Milwaukee & St. Paul Ry. Co.*, 38 Minn, 281, 37 N. W. 782; *State v. F., E. & M. V. R. R. Co.*, 22 Neb. 313, 35 N. W. 118; *Chicago, etc. R. R. Co. v. Iowa*, 94 U. S. 155, 24 L. Ed. 94; *Peik v. Chicago, etc. Railway Co.*, 94 U. S. 164, 24 L. Ed. 97; *Chicago, etc. R. R. Co. v. Ackley*, 94 U. S. 179, 24 L. Ed. 99; *Winona & St. Peter R. R. Co. v. Blake*, 94 U. S. 180, 24 L. Ed. 99; *Stone v. Wisconsin*, 94 U. S. 181, 24 L. Ed. 102; *Ruggles v. Illinois*, 108 U. S. 526, 2 Sup. Ct. 832, 27 L. Ed. 812; *Illinois Central R. R. Co. v. Illinois*, 108 U. S. 541, 2 Sup. Ct. 839, 27 L. Ed. 818; *Stone v. Farmers' Loan & Trust Co.*, 116 U. S. 307, 6 Sup. Ct. 334, 388, 1191, 29 L. Ed. 636; *Stone v. Illinois Central Railroad Co.*, 116 U. S. 347, 6 Sup. Ct. 348, 388, 1191, 29 L. Ed. 650; *Stone v. N. O. & N. E. Railroad Co.*, 116 U. S. 352, 6 Sup. Ct. 349, 391, 29 L. Ed. 651; *Dow v. Beidelman*, 125 U. S. 680, 8 Sup. Ct. 1028, 31 L. Ed. 841; *Charlotte &c. Railroad v. Gibbes*, 142 U. S. 386, 12 Sup. Ct. 255, 35 L. Ed. 1051; *Chicago &c. Railway Co. v. Wellman*, 143 U. S. 339, 12 Sup. Ct. 400, 36 L. Ed. 176; *Pearsall v. Great Northern Railway*, 161 U. S. 646, 665, 16 Sup. Ct. 705, 40 L. Ed. 838; *Minneapolis & St. Louis R'D Co. v. Minnesota*, 186 U. S. 257, 22 Sup. Ct. 900, 46 L. Ed. 1151; *Minn. & St. Louis R. R. Co. v. Minnesota*, 193 U. S. 53, 24 Sup. Ct. 396, 48 L. Ed. 614; *C. B. & Q. Railway v. Drainage Comm'rs*, 200 U. S. 561, 584, 26 Sup. Ct. 341, 50 L. Ed. 596; *Atlantic Coast Line v. Florida*, 203 U. S. 256, 27 Sup. Ct. 108, 51 L. Ed. 174; *Seaboard Air Line v. Florida*, 203 U. S. 261, 27 Sup. Ct. 109, 51 L. Ed. 261;

*Commissioners v. A. C. L. Ry.*, 71 S. C. 130, 50 S. E. 641.

In fact, the power of the legislature to delegate merely administrative functions in this manner has been so thoroughly established in the several states, and so often held by the federal supreme court to apply to acts of congress, that the question is no longer an open one. The latest utterance of the United States supreme court upon the subject is in the case of *Atlantic Coast Line v. N. Car. Corp. Com'n*, 206 U. S. 1, 27 Sup. Ct. 585, 51 L. Ed. 933, in which Mr. Justice White, speaking for the court, used the following language:

"The elementary proposition that railroads from the public nature of the business by them carried on and the interest which the public have in their operation are subject, as to their state business, to state regulation, which may be exerted either directly by the legislative authority or by the administrative bodies endowed with power to that end, is not and could not be successfully questioned in view of the long line of authorities sustaining that doctrine." (Page 19.)

The next contention is that the act is void because it confers upon the board a combination of legislative, executive and judicial powers. It is sought to bring the case within the doctrine declared by this court in *The State v. Johnson*, 61 Kan. 803, 60 Pac. 1068, 49 L. R. A. 662. In construing the act we start with the elementary proposition which all courts recognize: that every statute is presumed to be constitutional, and that no act of the legislature should be held to be unconstitutional unless its vice is apparent.

It must be observed that none of the powers which the act confers upon the board is authorized by the constitution to be performed by any other person or officer or tribunal. In the absence of any limitation in the constitution the legislature has full power to make laws and create agencies to carry them into effect.

The particular objection to the statute is that section

31—76 KAN.

5970 of the General Statutes of 1901, and sections 4 and 9 of chapter 340, Laws of 1905, combine executive, legislative and judicial power. The first clause of section 5970 reads as follows: "Whenever in the judgment of the railroad commissioners it shall appear that any railroad corporation or other transportation company fails in any respect or particular to comply with the terms of its charter or the laws of the state," etc. In the same section it is provided that "said commissioners shall inform such corporation of the improvement and changes which they adjudge to be proper, by a notice thereof in writing, . . . and if such orders are not complied with, the said commissioners, upon complaint, shall proceed to enforce the same in accordance with the provisions of this act as in other cases."

It must be apparent that the use of the words "judgment" and "adjudge" in this section does not contemplate a judicial judgment. The commissioners do not exercise judicial power within the meaning of that word as used in the constitution. When we come to consider this section with the other provisions of the act we find that after determining that "any change in the mode of operating its road and conducting its business is reasonable and expedient in order to promote the security, convenience and accommodation of the public," the board has no power to enforce an order to that effect. It may inform the company of the changes it desires made, but is powerless to compel any change until a hearing has been had "upon complaint," which means a full hearing, of which the company has been notified and at which it may appear and participate; and even after this has been done the board can only order that changes shall be made. The order is not conclusive or binding upon the company, and the company, if it see fit, may ignore it until the reasonableness and lawfulness of the order have been solemnly adjudged by a court. There is no commingling of legislative, executive and judicial powers, so apparent in

the court of visitation act, which conferred upon that tribunal the power to hear and decide, and to render a judgment and enforce it as a court.

The finding and order of the board that a change in the operation of the road is expedient and reasonable, under section 5970, *supra,* partakes of none of the characteristics of a judgment rendered by a court. As observed, the road may ignore it. When mandamus proceedings are brought to enforce it the order itself is only *prima facie* evidence of its reasonableness. Not being conclusive, it affects the railroad company only as a rule of evidence. The same may be said of sections 4 and 5 of chapter 340 of the Laws of 1905. Section 4, expressly, and section 5, by necessary inference, require a hearing upon complaint, and the order when made has the same force as the order provided for in section 5970, *supra,* and no other or greater effect. The functions of the board under this act are, as we have said, purely administrative, and the fact that in the performance of these functions the board must hear complaints and determine them does not make their acts judicial. It is not every act which requires the exercise of judgment and discretion which can be said to be judicial. Cooley, in volume 2 of the third edition of his work on Torts, at page 752, says:

"Official duties are supposed to be susceptible of classification under the three heads of legislative, executive, and judicial, corresponding to the three departments of government bearing the same designations; but the classification cannot be very exact and there are many officers whose duties cannot properly, or, at least, exclusively, be arranged under either of these heads."

Where judgment or discretion is exercised as a mere incident to a ministerial power it has never been held to be the exercise of judicial power within the meaning of constitutions which, like ours, provide for the separation of the three departments of government. (*Owners of Lands v. The People ex rel.,* 113 Ill. 296;

*Rich et al. v. City of Chicago,* 59 Ill. 286, 295.) In fact, the cases we have quoted from sustaining the power of legislatures to create boards of this character, and to confer upon them power to regulate and control common carriers, afford a sufficient answer to the contention that the power conferred is either legislative, executive or judicial.

A further objection to the validity of the act is because of the powers conferred upon this court. It is insisted, first, that it confers upon the court legislative powers, and, second, non-judicial powers, which it is urged fall within neither the original nor the appellate jurisdiction granted to the court by the constitution.

Section 5998 of the General Statutes of 1901 authorizes mandamus proceedings in the supreme court to enforce the orders of the board, and provides that the practice in such proceedings shall be as in other cases of mandamus. The particular objection upon which both of these claims are based is the provision that in such action "the court may direct the railroad company affected thereby to comply with any part of any rule, order or regulation of the board, and may hold any part of the same unreasonable, and refuse to enforce such part, without affecting the part found to be reasonable and just." It is said that when the court directs compliance with part of the original order it acts in a legislative capacity, or, if not in a legislative, at least in a non-judicial capacity.

A similar contention was raised in *Callen v. Junction City,* 43 Kan. 627, 23 Pac. 652, 7 L. R. A. 736. The act under consideration authorized the judge of the district court to make findings of fact upon the petition of the city council of a city of the second class desiring to add to the territory of such city. The judge was empowered to make findings as to the advisability of adding such territory—that is, whether the addition would be to the interest of the city, and also whether it would cause manifest injury to persons

owning real estate within the territory sought to be added; whether it was advisable to add some portions of the territory and unadvisable to add other portions. It was held that, while the power to create and regulate municipal corporations and define their boundaries is purely legislative, as the act authorized cities to enlarge their boundaries on certain conditions, depending upon certain facts, the existence of those conditions was made by the act the subject of judicial inquiry and determination; that the city council in its discretion made the local regulation, but that the question whether that discretion had been exercised within the limitations of the power delegated "is a judicial question pure and simple." (Page 633.) The doctrine of the case quoted from has been followed in the cases of *Huling v. The City of Topeka,* 44 Kan. 577, 24 Pac. 1110, *Hurla v. Kansas City,* 46 Kan. 738, 27 Pac. 143, *City of Emporia v. Randolph,* 56 Kan. 117, 42 Pac. 376, *Eskridge v. Emporia,* 63 Kan. 368, 65 Pac. 694, *Hutchinson v. Leimbach,* 68 Kan. 37, 74 Pac. 598, 63 L. R. A. 630, 104 Am. St. Rep. 384.

In the present case the legislature declares what the law shall be, and delegates to a commission the administrative power to carry the legislative will into effect on certain conditions depending upon facts, and the question whether the discretion of the administrative body has been exercised within the limitations of the power delegated is a judicial question. If the conditions exist, if the order of the board is reasonable and just, then the law declares that a duty rests upon the railroad company to obey the order. The action of mandamus lies to compel the performance of some official or corporate act by a public officer or corporation when no other adequate, specific remedy exists. (*Smalley v. Yates, Mayor,* 36 Kan. 519, 523, 13 Pac. 845.) The doctrine of the decided cases is that the inquiry by the courts as to the reasonableness of a schedule of rates or other regulation, whether made by the legislature or through a commission, is purely a judi-

cial inquiry, and the legislature may expressly confer the power upon the courts. (*Reagan v. Farmers' Loan & Trust Co.*, 154 U. S. 362, 14 Sup. Ct. 1047, 38 L. Ed. 1014; *Smyth v. Ames,* 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819; *St. L. & San Francisco Railway v. Gill,* 156 U. S. 649, 657, 15 Sup. Ct. 484, 39 L. Ed. 567.)

In the statutes enacted by other states creating railroad commissions similar provisions are made for the purpose of furnishing to the railroad companies affected thereby due process of law. In the majority opinion by Mr. Justice Blatchford, in the Minnesota case (134 U. S. 418, 10 Sup. Ct. 702, 33 L. Ed. 970), it was said:

"The question of the reasonableness of a rate of charge for transportation by a railroad company, involving as it does the element of reasonableness both as regards the company and as regards the public, is eminently a question for judicial investigation, requiring due process of law for its determination." (Page 458. To the same effect see *In re Canada Northern Ry.,* 7 Fed. 653.)

There is nothing substantial in the contention that the statute authorizes the court to try the whole controversy and make such orders as it may deem reasonable and just, and that the order when reviewed and revised becomes a judicial order. This court is not given authority by the act to make any rule, order or regulation. Its authority is limited to the inquiry whether the order already issued is reasonable and just. The order may embrace separate and distinct things; it may seek to compel the doing of a number of things, some of which the evidence may show would not be reasonable or just. If the things ordered to be done are in their nature such that they can be segregated, the judgment of the court may direct that some of the things ordered shall be performed, and refuse the peremptory writ as to the other things. The power to do this is analogous to the powers courts possess, in passing upon the validity of an act of the legislature, to uphold certain parts of the act and to decide

other portions to be invalid, where the several portions are not so associated and connected that the whole must stand or fall together.

It is contended that the act deprives defendant of its property without due process of law. Section 5999 of the General Statutes of 1901 provides:

"Said board of railroad commissioners shall not make any regulation, order, finding or decision against any railroad company or enter into any investigation affecting any railroad company without giving such railroad company reasonable notice thereof and an opportunity to appear and be heard in respect to the same."

And section 5970 especially provides: "The said commissioners, upon complaint, shall proceed to enforce the same in accordance with the provisions of this act as in other cases." Defendant, having been notified, appeared before the board and contested the matter in the manner provided for by the statute. (*Commissioners v. A. C. L. Ry.*, 71 S. C. 130, 50 S. E. 641; *Louisville and Nashville Rd. Co. v. Schmidt*, 177 U. S. 230, 20 Sup. Ct. 620, 44 L. Ed. 747.) In the latter case it was said:

"It is no longer open to contention that the due process clause of the fourteenth amendment to the constitution of the United States does not control mere forms of procedure in state courts or regulate practice therein. All its requirements are complied with provided in the proceedings which are claimed not to have been due process of law the person condemned has had sufficient notice and adequate opportunity has been afforded him to defend." (Page 236.)

In the opinion declaring the Minnesota act void because of its failure to provide due process of law Mr. Justice Blatchford used this language:

"No hearing is provided for, no summons or notice to the company before the commission has found what it is to find and declared what it is to declare, no opportunity provided for the company to introduce witnesses before the commission, in fact, nothing which has the semblance of due process of law." (*Chicago*

&c. *Railway Co. v. Minnesota,* 134 U. S. 418, 457, 10 Sup. Ct. 702, 33 L. Ed. 970.)

We have already referred to the court procedure provided for in the act by which any railroad company affected by the order of the board is given an opportunity to contest the matter. These provisions make it plain that no property rights of any railroad company can be finally affected or disturbed until there has been a judicial determination of the reasonableness and justness of the order by a court of competent jurisdiction, and these provisions we think furnish due process of law.

It is further contended that the act is invalid because the constitution of the state does not grant to the legislature the power to create a board of railroad commissioners, and there is no reference in the constitution to such a board. The constitution of the United States does not mention a federal commission, but congress under the commerce clause has created one the validity of which has been repeatedly upheld by the federal supreme court. Where the constitution has imposed no limitations upon the power of the legislature to enact laws its power is absolute and plenary. (*Leavenworth County v. Miller,* 7 Kan. 479, 12 Am. Rep. 425; *Harding v. Funk,* 8 Kan. 315; *Wadsworth v. Union Pacific Ry. Co.,* 18 Colo. 600, 33 Pac. 515, 23 L. R. A. 812, 36 Am. St. Rep. 309.) In the case of *Leavenworth Co. v. Miller, supra,* Mr. Justice Valentine said:

"As the people have by the constitution clothed the legislature with all the legislative power of the state, . . . the state legislature have all the legislative power that the people of the state have power to give them." (Pages 501, 508.)

Unless, therefore, it can be said that the act in question is not lawful for some other sufficient reason, the fact that the lawmaking power has enacted it into law is conclusive upon the courts; and where it does not appear to violate any express or implied provision

of the constitution the courts have no authority to declare it invalid because the constitution does not in express terms declare that the legislature shall have the power to enact it. The subjects upon which the legislature may enact laws are not enumerated in the constitution. The legislature may legislate upon any and all subjects not prohibited by express words or by necessary implication. The courts look to the constitution to determine, not what it authorizes, but what it forbids. (*Township of Pine Grove v. Talcott*, 86 U. S. 666, 676, 22 L. Ed. 227; *State of Iowa v. Forkner*, 94 Iowa, 1, 62 N. W. 772, 28 L. R. A. 206; Cooley's Const. Lim., 7th ed., 128.)

Finally, a general objection is urged that the act places the entire control and regulation of railroads upon a political commission and deprives the owners of the roads of all control and regulation except to finance the companies to which the roads belong. The extent to which the legislature shall extend its control and regulation of common carriers rests in the discretion of the legislature alone, except that it must of course be reasonable and just and must not deprive the owners of a fair and reasonable return upon their investment. (*The State v. Johnson*, 61 Kan. 803, 60 Pac. 1068, 49 L. R. A. 662.) The private right of ownership of the railroads differs from that of ordinary property. It is a right which coexists with the power of the state to regulate the business on account of its public nature.

"A railroad is a public highway, and none the less so because constructed and maintained through the agency of a corporation deriving its existence and powers from the state. Such a corporation was created for public purposes. It performs a function of the state. Its authority to exercise the right of eminent domain and to charge tolls was given primarily for the benefit of the public. It is under governmental control, though such control must be exercised with due regard to the constitutional guaranties for the protection of its property." (*Smyth v. Ames*, 169 U. S. 466, 544, 18 Sup. Ct. 418, 42 L. Ed. 819.)

(See, also, *Louisville and Nash. R'd Co. v. Kentucky*, 183 U. S. 503, 22 Sup. Ct. 95, 46 L. Ed. 298; *Railroad Connection Case*, 137 N. C. 1, 49 S. E. 191, 115 Am. St. Rep. 636; *Atlantic Coast Line v. N. Car. Corp. Com'n*, 206 U. S. 1, 27 Sup. Ct. 585, 51 L. Ed. 933.)

But the extent of the powers conferred on the board by the entire act is not a subject of judicial inquiry in this proceeding. The particular order which defendant refuses to obey is one which clearly falls within the natural and legitimate scope of legislative control and regulation. It is therefore unnecessary to consider every provision of the act, or to inquire whether in some of them the legislature has exceeded its authority. "Objections to the constitutional validity of statutes can be made only by those to whom the enactment applies and against whom attempts to enforce it are made." (*The State v. Smiley*, 65 Kan. 240 [syllabus], 69 Pac. 199, 67 L. R. A. 903.)

Since none of the reasons urged against the validity of the act is such as to render it obnoxious to the constitution, there remains the question whether the order of the board is reasonable and just. It is claimed by counsel for defendant that the order is upon its face unreasonable. It is as follows:

"Now, on this 7th day of December, 1905, after hearing the evidence and argument of counsel in the above-entitled action, the board finds that during the years 1902 and 1903, when the respondent railway company operated a passenger-train on said Madison branch of its line, the said passenger-train was operated at a loss, and there was no testimony introduced at this hearing that the train, if put on as asked for by the petitioners, could be operated at a profit to the respondent company. The board believes that the people along the line of the Madison branch of said company are entitled to better passenger-train service than they are now receiving, and it has been represented to the board by officers of said company that the respondent is constructing motor-cars for establishment on its branch lines that can be operated at a much less expense than steam service."

The contention urged at length is that the finding that in 1902 and 1903 the operation of a passenger-train was at a loss, and the further finding that no showing had been made to the board that if put on again in compliance with the request and complaint it could be operated with a profit, amount to a finding of fact that the order is unreasonable. But we agree with the finding of the referee that this does not necessarily follow as a conclusion from the foregoing findings. There is no finding that in 1902 and 1903 any revenues except those derived from passenger traffic were considered; and it needs no citation of authorities to show that even though the receipts of revenues from passenger traffic alone are insufficient, yet if the combined revenues of freight and passenger traffic justify the expense of separate passenger-trains the company cannot claim that it is unreasonable to require separate passenger-trains to be operated.

We find it difficult, if not quite impossible, to consider the question whether this order was or was not reasonable upon its face, without to some extent at least considering the character of the order itself. Suppose the order had required something extraordinary of defendant, as, for instance, two passenger-trains daily each way, or that vestibule cars or reclining-chair cars be put on and operated: it will hardly be denied that much less evidence would be required to overcome the *prima facie* showing or presumption that the order was a reasonable one than would be required in a case where the order only directs the railway company to do that which every one naturally expects would be done, in view of the manner in which railroads have usually been operated. Since railroads were first introduced there has been much variation, and there always will be, in the character, kind and sufficiency of the service rendered the public, depending upon the public requirements, the location, surroundings and traffic of each particular railroad. What would be a reasonable kind of service, and might be

reasonably insisted upon by the public, under one set of circumstances would not be reasonable under other and different circumstances. On the other hand, it is usual and customary wherever railroads are operated to provide one kind of service for passenger traffic and another for freight.

There is considerable force in the contention of the plaintiff that a railroad chartered as this was fails to comply with its charter obligations if it only operates mixed trains and compels passengers to submit to the danger and inconvenience of that kind of service. The charter of the Interstate Railroad Company, the obligations of which were assumed by defendant, authorized it to construct, maintain and operate a standard gage railway. Section 1322 of the General Statutes of 1901 provides:

"Every railway corporation in this state which now is or may hereafter be engaged in the transportation of passengers . . . shall furnish sufficient accommodation for the transportation of all such passengers, baggage, mails and express freight as shall within a reasonable time previous thereto be offered for transportation at the place of starting, at the junction of other roads, and at the several stopping-places."

The question was before the supreme court of Illinois in *The People v. St. L., A. & T. H. R. R. Co.*, 176 Ill. 512, 52 N. E. 292, 35 L. R. A. 656. In the opinion it was said:

"The main question in this case is whether a railroad company can be compelled by mandamus to run a passenger-train. The appellee operates about fifty miles of railroad running from DuQuoin easterly to Eldorado, which it leased in 1880 for 985 years from the Belleville and Eldorado Railroad Company; and it is conceded that it runs no passenger-train, that is, no train for passenger service exclusively, over this distance of fifty miles between DuQuoin and Eldorado. . . . but the only train which runs the whole length of the branch road between DuQuoin and Eldorado is what is called a mixed train, consisting of coal-, stock- and freight-cars, to which are attached a combination car and passenger-coach." (Page 517.)

The Illinois statute is no broader in its terms than ours, nor any more definite in stating what the duty of the railroad company is in respect to the kind of passenger service it shall furnish. It reads as follows:

"Every railroad corporation in the state shall furnish, start and run cars for the transportation of such passengers and property as shall, within a reasonable time previous thereto, be ready or be offered for transportation at the several stations on its railroads and at the junctions of other railroads, and at such stopping-places as may be established for receiving and discharging way passengers and freights." (2 Starr. & Cur. Stat., 2d ed., p. 3277.)

The opinion last quoted from further reads:

"It cannot be said that the carriage of passengers in a car attached to a freight-train is a suitable and proper operation of a railroad, so far as the carriage of passengers is concerned. The transportation of passengers on a freight-train, or on a mixed train, is subordinate to the transportation of freight, a mere incident to the business of carrying freight. To furnish such cars as are necessary for the suitable and proper carriage of passengers involves the necessity of adopting that mode of carrying passengers which is best adapted to secure their safety and convenience. . . . We are not unmindful of the fact that, within certain limits, a discretion may be exercised as to what rolling-stock and equipment are necessary for the suitable and proper operation of a railroad carrying passengers. When the mode of carrying passengers is separate from the mode of carrying freight the legitimate exercise of discretion may begin. What we hold is that there cannot be suitable and proper operation of the railroad as a carrier of passengers when the car in which it carries its passengers is part of a freight-train, because freight-trains are inferior to passenger-trains, and travel in them is attended with less comfort, convenience and safety than travel in passenger-trains. The inferiority of a freight-train to a passenger-train as a mode of carrying passengers is so obvious that no man of ordinary understanding would regard the use of a freight-train for the purpose of hauling a passenger-car as a suitable and proper operation of a railroad in the matter of transporting passengers." (Pages 524, 526.)

Section 1316 of the General Statutes of 1901 provides:

"Every railway corporation shall, in addition to the powers hereinbefore conferred, have power . . .

"*Eighth.* To regulate the time and manner in which the passengers and property shall be transported, and the compensation to be paid therefor; said compensation not to exceed the rates fixed by law."

Defendant contends that, this being the law when its charter was granted, it became a part of the contract between the company and the state. It is conceded that the legislature might lawfully repeal this provision, but it is claimed that as the provision never has been expressly repealed, and as repeals by implication are not favored, the railway company still has the power conferred by the act.

The question of repeals by implication is not involved. Railroads still possess the power to regulate the time and manner in which passengers shall be transported, as conferred upon them by section 1316, *supra,* but this never meant that a railroad company has the right to furnish flat-cars, for instance, for the transportation of passengers. The construction which defendant asks us to place upon section 1316 is contrary to the rule that a construction will not be given which yields the power of the legislature to enact legislation upon the same subject. A railroad charter is taken and held subject to the power of the state to regulate and control the grant in the interest of the public. (*Louisville and Nash. R'D Co. v. Kentucky,* 183 U. S. 503, 22 Sup. Ct. 95, 46 L. Ed. 298.) But a stronger reason is that it must be construed with section 1322 of the same act, which requires railroad companies to furnish sufficient accommodation for the transportation of passengers. Exactly the same defense was set up in the case of *The People v. St. L., A. & T. H. R. R. Co.,* 176 Ill. 512, 52 N. E. 292, 35 L. R. A. 656, but the court declared that "the discretionary power of railroad companies in this respect is subject

always to the condition that there is no statutory provision limiting and restricting such power, and that its exercise is not opposed to the terms of the charter. . . : This discretion is also subject to the condition that it must be exercised in good faith and with a due regard to the necessities and convenience of the public" (p. 523), citing *The People ex rel. v. C. & A. R. R. Co.,* 130 Ill. 175, 22 N. E. 857; *M. & O. R. R. Co. v. The People,* 132 Ill. 559, 24 N. E. 643, 22 Am. St. Rep. 556; 2 Morawetz, Corp., 2d ed., § 1119. (See, also, *Railroad Connection Case,* 137 N. C. 1, 49 S. E. 191, 115 Am. St. Rep. 636.)

We have quoted at some length from the opinion in the Illinois case. The issue was not so much a question of the reasonableness of requiring separate passenger-trains as it was a question of the absolute right of the state to demand such service under statutory and charter provisions similar to ours. The reasons upon which the opinion is based apply with much force to the question under consideration here. It is unnecessary to decide the question involved directly in that case; but we hold that the order of the board under all the circumstances is not upon its face an unreasonable one.

The burden of proof was, therefore, on the defendant to show that the order is unreasonable. The referee, among other findings of fact, made the following:

"(2) The Madison line, as built and operated, extends from Montieth Junction, Mo., to Madison, Greenwood county, Kansas, a distance of 108 miles, 89 miles of which are within the state of Kansas; but trains have been run from Butler, Mo., on account of there being no terminal facilities at Montieth Junction. The distance from Montieth Junction to Butler is about three miles. At Montieth Junction the Madison line connects with the Joplin line of the Missouri Pacific, giving connections to Kansas City, St. Louis and other points north, south and east."

"(10) The evidence does not furnish data, made up in the same way, of earnings and expenses for the same periods of time in the operation of this line. Consequently, only an approximation can be made in a com-

parison of earnings and expenses. Part of the time the Madison line was an accounting division by itself and correct accounts of receipts and expenditures ought to be available. They have been furnished for part of the expenses, but not for the earnings, and the latter, especially as to freights, are approximated by prorating on a mileage basis. Such approximation is inaccurate, and in some instances at least has been made up for this case by a method which is different from that ordinarily used by the company. In the matter of freight earnings it has been and still is the rule of the defendant company, in making a division of freight earnings between any particular line and the other lines, to apportion such earnings on a mileage basis, but the line on which the shipment originates or where it terminates is given a minimum mileage of fifty miles where there is a long haul on other lines and a short haul—twelve or twenty miles for example—on the line that receives or delivers the shipment. This rule was disregarded in making up the tables in evidence in this case, so that they do not correctly show what freight earnings should be credited to the Madison line during any particular period.

"In the matter of the earnings of passenger-trains, the moneys received from express companies for the carriage of express matter is an approximation based upon business done in 1889 and 1890, which cannot be said to be any proper standard of comparison for this case.

"(11) The passenger earnings above stated are ascertained, not including the estimate of the express business as stated in the tenth finding, almost wholly from actual accounts of the passenger-train business on this line. The freight earnings are simply estimated by taking the earnings of the Kansas & Colorado system and apportioning to the Madison line its pro rata on a mileage basis. The actual freight earnings are probably considerably greater than stated.

"(12) The earnings of the Kansas & Colorado Pacific Railway Company for the time named in the last finding were $10,673,778.71, and the expenses of operation and maintenance $9,043,107.44, showing net earnings of $1,630,671.27. For the year ending April 1, 1906, the freight earnings and expenses on the Kan-

sas & Colorado Pacific line were, as approximated on mileage basis:

| | |
|---|---|
| Earnings | $6,146,283.82 |
| Expenses | 5,162,679.96 |
| Net earnings | $983,603.86 |

"(13) The total freight earnings from freight traffic which originated or terminated on the Madison line, or which passed over some part of that line, amounted to the sum of $125,947.79 from May 1, 1905, to April 1, 1906. Of this there has been apportioned to the Madison line, for the purpose of showing in this case the freight earnings thereof, the sum of $22,369.39. This amount is obtained by giving to the Madison line the proportion of the earnings which the haul on that line bears to the entire haul on all the Missouri Pacific lines. Such apportionment does not, however, make a true and just division of earnings to which this line is entitled, and the evidence furnishes no data by which a proper division of earnings can be determined."

"(19) All the estimates made in the foregoing findings of earnings and expenses include both state and interstate traffic. No method of separation is possible on the evidence."

"(23) During the time the defendant company maintained separate passenger service on the Madison line it had the contract to carry the government mails thereon, for which it was paid the sum of $5000 yearly. Under the mixed-train service the government does not use the railroad for mail service to points on this line."

Among his conclusions of law are the following:

"(3) The finding of the board that during the years 1902 and 1903 the passenger-train was operated at a loss does not shift the burden of proof in this case upon the state, when the further finding is made that the people along the line of the road are entitled to a better service than that afforded by only a mixed train, and the defendant company is ordered to provide separate passenger service. It will be presumed that the order was based upon a consideration of the general traffic and revenues of this line of road.

"(4) Since the defendant has combined this line of road, for operation, management and accounting, with the Kansas & Colorado Pacific Railway Company lines,

so as practically to constitute the twelve lines embraced by that company a single unit for purposes of operation, and no definite ascertainment of the actual earnings of the Madison line can be made, a separate passenger service should be maintained if the net earnings of the Kansas & Colorado Pacific Railway justify such service.

"(5) The Madison line, if dependent upon its own traffic and not used as a feeder to other Missouri Pacific lines, would not pay the cost of maintaining separate passenger- and freight-trains, and an order for such service would not be reasonable. But considered as a part of the Missouri Pacific system, I think a requirement of such service would not be unreasonable.

"(6) The burden of proof being upon the defendant, it has failed to show that the traffic—passenger and freight—originating or terminating on the Madison line does not contribute to the earnings of the other lines of the system operated by defendant company in sufficient amount to entitle the people along the line to a better service, and has failed to show that the order, for such service is not a reasonable requirement.

"(7) The Madison line is interstate in construction, connections and operation, the running of trains from Madison to Monteith Junction or Butler being necessary in order to give the operating company any reasonable opportunity to meet expenses of such operation. It would be unreasonable to require a separate passenger-train to be operated on this line only within this state."

The referee found that defendant, upon whom rested the burden of proof, had failed to produce evidence which ought to have been available—evidence which from its nature defendant must have had in its possession or control; that portions of the estimates were approximations which he finds "inaccurate and in some instances at least . . . made up for this case by a method which is different from that ordinarily used by the company"; that the rule in force by the company for ascertaining the true proportion of freight earnings between any particular line and other lines was disregarded in making up the tables in evidence, so that they do not correctly show what freight earnings should be credited to the Madison line during any particular

period; that the figures presented to show the express earnings were "based upon business done in 1889 and 1890"; and further that the amount of freight earnings apportioned to the Madison line is obtained by a method of accounting which does not "make a true and just division of earnings to which this line is entitled, and the evidence furnishes no data by which a proper division of earnings can be determined."

In the face of these findings we are unable to concur in some of the conclusions of law reached by the referee. The fifth conclusion of law, to the effect that the Madison line would not pay the cost of separate passenger-trains, is not supported by the facts in evidence as established by the previous findings. It appears to rest solely upon the theory that as the evidence showed that the road is operated as a continuous line from Monteith Junction, and is interstate in its connections, and because no data was furnished to show its earnings within the state, therefore it follows that its revenues can only be determined by considering its proportion as a part of the Missouri Pacific system. No matter how much evidence was introduced showing that this line is operated as a continuous line from Monteith Junction in Missouri to the end of the road in Kansas, and is interstate in its connections, still the matter is not thereby necessarily concluded. The order might still be reasonable, dependent upon its earnings derived from that part of the line wholly within the state of Kansas. Findings had already been made showing that this road extends for eighty-nine miles into the state of Kansas and twelve miles east into Missouri; that in Kansas it crosses four counties, the least populous of which contains over 13,000 people; that it is the only railroad at Mound City, the county-seat of Linn county; that it intersects in Kansas eight other roads, six of which are no part of the Missouri Pacific system. Some of its traffic is, of course, interstate, but some, how much does not appear, must necessarily be domestic, arising and terminating wholly

within the state. If from either of the six roads it intersects in which the Missouri Pacific system has no interest freight arising wholly in Kansas should be received by it to be hauled to Mound City or to any other points in Kansas, it would be entitled to receive its proportionate share of the charges. It is inconceivable that its earnings can only be determined by treating it as a part of the Missouri Pacific system.

Defendant had the opportunity given it to prove, and may have been able to prove, that its earnings from business arising wholly within the state are much less than the expenses properly chargeable to that portion of its line, but instead of doing so it failed; and the only inference that can be drawn from the referee's findings of fact is that it made no honest effort to do this, but, on the contrary, introduced approximate estimates prepared for the occasion, contrary to the ordinary rules for proportioning the earnings and expenses between other roads and a line of road operated as this was. The effect of this class of evidence was to deprive this branch line of the credit to which it is entitled by the findings of the referee, and the utmost that can be said for the evidence as a whole is that it left the controversy in doubt and conjecture. The *prima facie* effect of an order of this kind should not be overcome by evidence so unsatisfactory as that furnished from estimates of this character and from figures showing the earnings from express charges in 1889 and 1890, with no attempt to procure more recent data or to explain the reasons why it was not available, and with no attempt to show the earnings or expenses of the road properly chargeable to that portion lying within the state.

There is, by the way, in all the voluminous briefs of defendant no suggestion or intimation that the evidence produced overcame the *prima facie* case. Defendant relies upon three propositions: the unconstitutionality of the law, the unreasonableness of the order on its face, and the claim that, the Madison line being

The State v. Railway Co.

interstate in its connections and operation, any order of this character is an unjust interference with interstate commerce.

This is an original proceeding in mandamus. We are not bound by the referee's conclusions, either of fact or of law, as would be the case were the facts found by another court or a jury or referee of another court. We conclude, as a matter of law, from the evidence and findings of fact of the referee, that the *prima facie* effect of the order is not overcome by the evidence offered by defendant. The nature and character of the order itself are such as to require, in our opinion, some substantial showing upon the part of defendant to rebut the presumption that it is reasonable and just. To require of defendant that separate passenger-trains should be operated over that portion of its line within the state is, under all the circumstances of the case, so reasonable that it requires something more than mere inferences and doubts to prevail against the theory that it is just and reasonable. Nor do we think that defendant has produced or offered to produce the evidence which must have been within its power for the purpose of showing either the earnings or expenses from the operation of that portion of its line within the state.

Moreover, the fact that an order requiring a railroad company to furnish additional facilities for the accommodation of the public will occasion expense to the company and even loss of profits does not necessarily make the order unreasonable. (*Atlantic Coast Line v. N. Car. Corp. Com'n,* 206 U. S. 1, 27 Sup. Ct. 585, 51 L. Ed. 933.) As was said by the court in *Wisconsin &c. R'D Co. v. Jacobson,* 179 U. S. 287, 21 Sup. Ct. 115, 45 L. Ed. 194:

"Although to carry out the judgment may require the exercise by the plaintiff in error of the power of eminent domain, and will also result in some, comparatively speaking, small expense, yet neither fact furnishes an answer to the application of defendant in error." (Page 302.)

In *Atlantic Coast Line v. N. Car. Corp. Com'n, supra,* the order of the railroad commissioners of North Carolina required the company to change its schedule for the operation of its trains so as to furnish connections with through trains upon another road. In the opinion, after stating that a distinction necessarily exists between an order requiring additional facilities for the accommodation of the public and an order fixing rates, Mr. Justice White used this language:

"This is so because, as the primal duty of a carrier is to furnish adequate facilities to the public, that duty may well be compelled, although by doing so as an incident some pecuniary loss from rendering such service may result. . . . Of course, the fact that the furnishing of a necessary facility ordered may occasion an incidental pecuniary loss is an important criteria to be taken into view in determining the reasonableness of the order, but it is not the only one. As the duty to furnish necessary facilities is coterminous with the powers of the corporation, the obligation to discharge that duty must be considered in connection with the nature and productiveness of the corporate business as a whole, the character of the services required, and the public need for its performance." (Page 26.)

The act creating the board of railroad commissioners does not, in our opinion, affect, nor was it designed to affect, interstate commerce. The order of the board requiring defendant to operate separate passenger service within the state is in the exercise of its police power to enforce local regulations necessary for the convenience, safety and comfort of the public, and is not an attempt to regulate interstate commerce, nor does it directly cast a burden upon such commerce. Defendant is at liberty to operate any kind of service elsewhere upon its line that it may deem advisable or suitable to its purposes. (*The State v. Telegraph Co.,* 75 Kan. 609, 90 Pac. 299.) In the latter case Mr. Justice Burch, speaking for the court, said:

"It has been declared in a host of decisions that, in order to affect interstate commerce and government

business in the legal sense of the expression, state regulations must impinge directly upon them. Consequences which are indirect, remote and incidental only are not invalidating." (Page 650.)

In *Louisville &c. Railway Co. v. Mississippi*, 133 U. S. 587, 10 Sup. Ct. 348, 33 L. Ed. 784, it was held that a statute of Mississippi requiring a railroad to furnish separate compartments for white and black passengers, when applied to that portion of an interstate road within the state, is not placing a burden upon interstate commerce, although it was conceded that it required the railroad company to go to the expense of providing separate accommodations for use within the state which, when the same road crossed into another state, were not required. In the opinion Mr. Justice Brewer used the following language:

"So far as the first section is concerned (and it is with that alone we have to do), its provisions are fully complied with when to trains within the state is attached a separate car for colored passengers. This may cause an extra expense to the railroad company; but not more so than state statutes requiring certain accommodations at depots, compelling trains to stop at crossings of other railroads, and a multitude of other matters confessedly within the power of the state." (Page 591.)

In *Louisville & Nashville R'D v. Kentucky*, 161 U. S. 677, 16 Sup. Ct. 714, 40 L. Ed. 849, it was said:

"It has never been supposed that the dominant power of congress over interstate commerce took from the states the power of legislation with respect to the instruments of such commerce, so far as the legislation was within its ordinary police powers. Nearly all the railways in the country have been constructed under state authority, and it cannot be supposed that they intended to abandon their power over them as soon as they were finished. The power to construct them involves necessarily the power to impose such regulations upon their operation as a sound regard for the interests of the public may seem to render desirable." (Page 702.)

And in *Louisville and Nash. R'D Co. v. Kentucky,* 183 U. S. 503, 22 Sup. Ct. 95, 46 L. Ed. 298, the following language was used:

"It may be that the enforcement of the state regulation forbidding discrimination in rates in the case of articles of a like kind carried for different distances over the same line may somewhat affect commerce generally; but we have frequently held that such a result is too remote and indirect to be regarded as an interference with interstate commerce; that the interference with the commercial power of the general government must be direct, and not the merely incidental effect of enforcing the police powers of a state. *New York, Lake Erie and Western Railroad v. Pennsylvania,* 158 U. S. 431, 439, 15 Sup. Ct. 896, 39 L. Ed. 1043; *Henderson Bridge Co. v. Kentucky,* 166 U. S. 150, 17 Sup. Ct. 532, 41 L. Ed. 953." (Page 518.)

The enforcement of the order in this case is a mere incident to the police powers of the state. If it touches interstate commerce it is only in an incidental way, and no more than would an order compelling the railroad to fence its tracks, or regulate the speed of its trains, or conform to numerous other regulations which every one concedes the state may require without placing restrictions or burdens upon interstate commerce. It is said that the order cannot be complied with without forcing defendant to establish terminals at the state line. It is a matter of common observation that no elaborate system of terminals, roundhouses or shops is necessary to enable defendant to comply with an order of this character. It was expressly decided in *Smyth v. Ames,* 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819, that "the state cannot justify unreasonably low rates for domestic transportation, considered alone, upon the ground that the carrier is earning large profits on its interstate business, over which, so far as rates are concerned, the state has no control; nor can the carrier justify unreasonably high rates on domestic business upon the ground that it will be able only in that way

to meet losses on its interstate business." (Syllabus.) The doctrine thus declared is a two-edged sword. The carrier in order to meet losses on its interstate business cannot deprive the people along the line of its road within the state of reasonable facilities for travel; cannot oblige them, for instance, to travel upon freight-trains or flat-cars, or to be satisfied with what is unreasonably inadequate service.

One other matter deserves mention. The order is in the alternative, and requires defendant to adopt motor-car service for passengers on its line, if that be found practicable, or to establish and maintain separate passenger-train service. It is objected that defendant cannot, without violating its charter, comply with that part of the order requiring it to operate motor-cars, and that the board of railroad commissioners have no jurisdiction over any kind of a railroad except those operated by steam.

The part of the order requiring the establishment of motor-car service is a favor to defendant, intended as a matter of grace. The order requires separate passenger service, and gives defendant the right to put on motor-cars if it finds them practicable. The suggestion of the use of motor-cars came from defendant in the first place; and the answer sets up that defendant has been experimenting with that kind of cars, and that, although the practical utility of motor-cars is problematical, it is defendant's design to operate them if it be found that they can be successfully and economically operated. The board possessed the power to order separate passenger-trains established, and we need not stop to inquire into its power to authorize motor-cars in lieu thereof. If that part of the order cannot be complied with by defendant because motor-cars cannot be successfully and economically operated, or if the charter of defendant forbids it to change its motive power and operate such cars, none of these things can relieve it of the duty of obeying the other

part of the order. If the board had no power to order defendant to operate motor-cars, so much of the order is merely surplusage. The rest is valid.

The peremptory writ will issue.